STATE of Alaska, Appellant,

v.

Kyle J. ZERKEL, Appellee.

Jehu MARISCAL, Petitioner,

v.

STATE of Alaska, Respondent.

STATE of Alaska, Appellant,

v.

Kenneth HARRIS, Appellee.

STATE of Alaska, Appellant,

v.

Howard JERUE, Jr., Appellee.

MUNICIPALITY OF ANCHORAGE,
Appellant,

v.

Robert D. BECK, Appellee.

MUNICIPALITY OF ANCHORAGE,
Appellant,

v.

Marcus L. CHOQUETTE, Appellee.

MUNICIPALITY OF ANCHORAGE,
Appellant,

v.

Ricky A. HOFF, Appellee.

MUNICIPALITY OF ANCHORAGE,
Appellant,

v.

Irving J. IGTANLOC, Appellee.

MUNICIPALITY OF ANCHORAGE,
Appellant,

v.

Matthew P. KETCHUM, Appellee.

MUNICIPALITY OF ANCHORAGE,
Appellant,

v.

Rachel M. KONAHOK–McVEY, Appellee.

MUNICIPALITY OF ANCHORAGE,
Appellant,

v.

Harold D. JOHNSON, Jr., Appellee.

MUNICIPALITY OF ANCHORAGE,
Appellant,

v.

Robert C. MURRAY, Appellee.

MUNICIPALITY OF ANCHORAGE,
Appellant,

v.

Danny P. SHADLE, Appellee.

Nos. A–5773, A–5739, A–5774 to A–5785.

Court of Appeals of Alaska.

July 28, 1995.

Rehearing Denied Aug. 14, 1995.

James L. Walker, Asst. Mun. Prosecutor, and Mary K. Hughes, Mun. Atty., Anchorage, for appellant Municipality of Anchorage.

Frederick T. Slone, Kasmar and Slone, P.C., Anchorage, for appellees Harris, Jerue, and Hoff.

G. Blair McCune, Asst. Public Defender, and John B. Salemi, Public Defender, Anchorage, for petitioner Mariscal.

Eugene B. Cyrus, Anchorage, for appellee Zerkel.

Michael B. Logue, James E. Gorton & Associates, Anchorage, for appellees Beck and Choquette.

William B. Oberly, Anchorage, for appellee Igtanloc.

Michael J. Keenan, Anchorage, for appellee Ketchum.

William D. Artus, Anchorage, for appellee Konahok–McVey.

W. Grant Callow, II, Anchorage, for appellee Johnson.

Ben J. Esch, Garretson & Esch, Anchorage, for appellee Murray.

Richard D. Kibby, Anchorage, for appellee Shadle.

Before: BRYNER, C.J., and COATS and MANNHEIMER, JJ.

## OPINION

MANNHEIMER, Judge.

These consolidated appeals all involve defendants who were arrested for driving while intoxicated. In each case, the defendant either refused to take the breath test required by AS 28.35.031(a) or else took the test and the test results showed that the defendant's blood-alcohol level was .10 percent or higher. Based on either the defendant's refusal to take the test or the defendant's test result, the Department of Public Safety conducted administrative proceedings under AS 28.15.165–166 and, ultimately, revoked each defendant's driver's license.

At the same time, each defendant was also facing criminal prosecution in the district court. (Some of the defendants were prosecuted by the State of Alaska; the others were prosecuted by the Municipality of An-

Eric A. Johnson, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Atty. Gen., Juneau, for appellant/respondent State of Alaska.

chorage.) Each defendant was charged with either driving while intoxicated (DWI), AS 28.35.030(a), or refusing to submit to a breath test, AS 28.35.032(f), or both. Moreover, a few of the defendants had been driving even though their licenses previously had been suspended or revoked. These defendants, in addition to being charged with DWI and/or breath-test refusal, were also charged with driving while their license was suspended or revoked (DWLS or DWLR), AS 28.15.291(a).

After the defendants lost their driver's licenses (or had their license revocations extended) in the Department of Public Safety's administrative proceedings, they filed motions asking the district court to dismiss the pending criminal prosecutions. In each case, the defendants asserted that the pending criminal prosecutions violated the double jeopardy clause—the constitutional guarantee that no person be placed in jeopardy more than once for the same offense. *See* the Fifth and Fourteenth Amendments to the United States Constitution, and Article I, Section 9 of the Alaska Constitution. The defendants argued that, because they had already lost their driver's licenses for the same conduct that formed the basis of the criminal prosecutions (either testing at .10 percent blood alcohol or higher, or refusing the breath test), they had already been punished once for this conduct and could not be punished again.

With one exception (file number A–5739), the district court granted the defendants' motions and dismissed the criminal prosecutions.[1] The State and the Municipality of Anchorage now appeal those dismissals. In file number A–5739, the district court denied the defendant's motion to dismiss, and we granted the defendant's petition to review the district court's decision. For the reasons explained in this opinion, we reinstate the prosecutions that were dismissed and we affirm the district court's refusal to dismiss the prosecution in file number A–5739.

The defendants' double jeopardy argument rests on a trio of cases decided by the United States Supreme Court: *United States v. Halper*, 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989); *Austin v. United States*, — U.S. —, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993); and *Montana Department of Revenue v. Kurth Ranch*, — U.S. —, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994). In these cases, the Supreme Court expanded the scope of the double jeopardy clause, construing it to protect people from the imposition of certain "penalties", "forfeitures", and "taxes"—monetary impositions that traditionally had not been considered criminal punishments.

For purposes of analyzing the defendants' argument, it makes the most sense to begin by discussing *United States v. Halper*.

### *The Supreme Court's Decision in Halper*

The defendant in *Halper* perpetrated a scheme of Medicare fraud. Halper was the manager of a laboratory that performed medical procedures covered by Medicare. He submitted 65 claims in which he falsely described the medical procedure that his laboratory had performed, so that the government paid him $12.00 per procedure instead of $3.00. Thus, Halper defrauded the government of $585 (65 times $9.00). *Halper*, 490 U.S. at 437, 109 S.Ct. at 1895–96.

Halper was criminally prosecuted and convicted of 65 counts of fraud; he was sentenced to 2 years' imprisonment and a $5000 fine. 490 U.S. at 437, 109 S.Ct. at 1896. The federal government then commenced a civil action against Halper under the federal False Claims Act, 31 U.S.C. §§ 3729–3731. Under Section 3729 of this act, a person who submits a false claim against the government is "liable to the United States Government

---

1. It appears that the district court acted inadvertently when it dismissed the charges of driving with a suspended or revoked license. The defendants' motions addressed only the double jeopardy implications of the DWI and/or breath-test refusal charges. The district court's written decision was likewise limited to this issue.

Driving with a suspended or revoked license is a separate offense from refusing to take a breath test or driving with a blood-alcohol level of .10 percent or higher. Whether or not the administrative revocation of the defendants' licenses constituted "punishment" for the latter two offenses, the defendants charged with driving with a suspended or revoked license had not previously faced sanctions (either civil or criminal) for that conduct. Those charges should not have been dismissed.

for a civil penalty of $2000, [plus] an amount equal to 2 times the amount of damages the Government sustains because of the [false claim], and [the] costs of the civil action". The federal district court construed this statute to require a separate $2000 penalty for each of Halper's false claims; thus, the court believed itself obligated to impose a total penalty of $130,000 (65 times $2000) for fraudulent claims involving only $585. *Halper*, 490 U.S. at 438, 109 S.Ct. at 1896–97.

The federal district court refused to impose this penalty. The court ruled that such a penalty would constitute a second punishment (in violation of the double jeopardy clause) because the penalty so exceeded the government's actual loss. 490 U.S. at 439–440, 109 S.Ct. at 1896–97. The government appealed.

The Supreme Court noted that the double jeopardy clause embodies three distinct protections: the protection against a successive prosecution after a defendant has been acquitted, the protection against a successive prosecution after the defendant has been convicted, and the protection against multiple punishments for the same offense. *Halper*, 490 U.S. at 440, 109 S.Ct. at 1897. Because "proceedings and penalties under the civil False Claims Act are indeed civil in nature", 490 U.S. at 442, 109 S.Ct. at 1898, the proceedings against Halper under the False Claims Act did not constitute a successive prosecution. Rather, the Court declared, "[t]he third of [the double jeopardy] protections [is] the one at issue here". 490 U.S. at 440, 109 S.Ct. at 1897. "The sole question here is whether the statutory penalty authorized by the civil False Claims Act ... constitutes a second 'punishment' for the purpose of [the] double jeopardy [clause]." 490 U.S. at 441, 109 S.Ct. at 1898.

The Supreme Court held that, under the facts of a particular case, the "civil penalty authorized by the Act may be so extreme and so divorced from the Government's damages and expenses as to constitute [a] punishment" for double jeopardy purposes. *Halper*, 490 U.S. at 442, 109 S.Ct. at 1898.

[A] civil as well as a criminal sanction [may constitute] punishment when the sanction as applied in the individual case serves the goals of punishment[,] ... the twin aims of retribution and deterrence.... [A] civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment [for purposes of double jeopardy analysis].... We therefore hold that under the Double Jeopardy Clause a defendant who already has been punished in a criminal prosecution may not be subjected to an additional civil sanction to the extent that the second sanction may not fairly be characterized as remedial, but only as a deterrent or [as] retribution.

*Halper*, 490 U.S. at 448–49, 109 S.Ct. at 1901–02 (internal citations omitted).

The Court expressly disavowed any intention of limiting civil penalties to the precise measure of the government's loss. Instead, the Court recognized that "the process of affixing a sanction that compensates the Government for all its costs inevitably involves an element of rough justice"; the Court pointed out that it had previously upheld statutes that imposed "reasonable liquidated damages" or "fixed-penalt[ies]" plus "double-damages". 490 U.S. at 449, 109 S.Ct. at 1902.

We cast no shadow on these time-honored judgments. What we announce now is a rule for the rare case, the case such as the one before us, where a fixed-penalty provision subjects a prolific but small-gauge offender to a sanction overwhelmingly disproportionate to the damages he has caused.

*Halper*, 490 U.S. at 449, 109 S.Ct. at 1902.

The Court declared that, whenever a defendant has already suffered a criminal penalty for illegal conduct and the government later seeks to impose a civil penalty for the same conduct, the defendant may raise the argument that "the civil penalty sought in the subsequent proceeding bears no rational relation to the goal of compensating the Government for its loss". Such a defendant would be "entitled to an accounting of the Government's damages and costs to determine if the penalty sought in fact constitutes

a second punishment". The trial judge would then use this accounting to determine "the size of the civil sanction the Government may receive without crossing the line between remedy and punishment". *Halper*, 490 U.S. at 449–450, 109 S.Ct. at 1902.[2]

### *Halper's Definition of the Distinction Between "Remedial" and "Punitive" Sanctions, and the Supreme Court's Later Refusal to Limit Itself to this Definition*

Turning to the case before us now, the defendants argue that, under *Halper*, the revocation of a driver's license must be viewed as a "punishment" rather than a "remedy". The defendants rely on the fact that the Supreme Court worded the test for distinguishing a remedial sanction from a punitive sanction in terms of whether "the civil penalty sought [by the government] bears [any] rational relation to the goal of compensating the [g]overnment for its loss". The defendants point out that the government will rarely suffer a monetary loss on account of a defendant's breath-test result or on account of a defendant's refusal to take a breath test. Moreover, even if the government could prove some monetary damage from the arrested driver's conduct, the act of revoking that person's operator's license does essentially nothing toward accomplishing the goal of compensating the government for the monetary loss that might attend the driver's taking or refusing the breath test. Thus, the defendants conclude, the revocation of a driv-

er's license must be classified as a "punishment" rather than a "remedy".

The defendants' argument ignores the factual context of *Halper*. *Halper* involved a civil proceeding instituted against a person who defrauded the government of money, and it involved a monetary penalty imposed on that person, ostensibly to compensate the government for its loss. In such a situation, the Supreme Court could readily frame the test for a "remedy" in terms of whether the monetary penalty imposed on Halper in the civil proceeding bore any relation to the monetary harm the government had suffered.

But there are other remedies besides restoration of lost money. According to *Webster's New World Dictionary* (Third College Edition, 1988), p. 1135, a "remedy" is "[any]thing that corrects, counteracts, or removes an evil or wrong". In its specialized legal sense, "remedy" is defined as "a means ... by which violation of a right is *prevented* or compensated for". *Id.* (Emphasis added.) Thus, restraining orders, injunctions, orders granting rescission, declaratory judgements concerning the constitutionality or construction of statutes, and coercive fines or imprisonment imposed under a court's civil contempt power are all "remedies". Dan B. Dobbs, *Handbook on the Law of Remedies* (1973), pp. 1–2. *See Helvering v. Mitchell*, 303 U.S. 391, 399, 58 S.Ct. 630, 633, 82 L.Ed. 917 (1938) ("Remedial sanctions may be of varying types").

---

**2.** In their brief, the defendants argue that any "sanction" is necessarily punitive—that a sanction can never be "remedial" for purposes of federal double jeopardy analysis. However, as exemplified by the just-quoted portion of *Halper*, (in which the Court refers to the permissible "size of the *civil sanction* the Government may receive") (emphasis added), the Supreme Court has not chosen to employ the word "sanction" in the limited sense suggested by the defendants. Rather, throughout the *Halper* opinion, the Court uses the word "sanction" in its broader sense of "whatever the government does to someone".

*Halper* repeatedly refers to sanctions as capable of being *either* punitive or remedial. For example, when discussing its previous decision in *Helvering v. Mitchell*, 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917 (1938) (which held that the statutory fifty-percent penalty on delinquent tax-

es was not a second criminal punishment), the *Halper* Court said:

> Whether the statutory sanction was criminal in nature, the [*Mitchell*] Court held, was a question of statutory interpretation; and, applying traditional canons of construction, the Court had little difficulty concluding that ... the deficiency sanction was in fact remedial[.] Since "in the civil enforcement of a remedial sanction there can be no double jeopardy", *id.* at 404, 58 S.Ct. at 636, the Court rejected Mitchell's claim.
>
> *Mitchell* ... makes clear that the Government may impose both a criminal and a civil sanction with respect to the same act or omission[.]

*Halper*, 490 U.S. at 442–43, 109 S.Ct. at 1898–99 (discussing *Helvering v. Mitchell*, 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917 (1938)) (internal citations omitted).

The Supreme Court's later decisions in *Austin v. United States* and in *Montana Department of Revenue v. Kurth Ranch* confirm that the "compensat[ion] ... for ... loss" phrasing used in *Halper* was not intended to be the sole criterion for determining whether a sanction should be deemed "punitive" or "remedial". In both *Austin* and *Kurth Ranch,* the Supreme Court used completely different criteria for evaluating whether the challenged sanction was "remedial" or "punitive".

In *Austin,* the defendant was convicted of drug offenses. In a contemporaneous civil action, the government sought forfeiture of the defendant's mobile home and his auto body shop under 21 U.S.C. § 881(a), a federal statute authorizing forfeiture of conveyances and real property used to commit or facilitate the commission of drug offenses. *Austin,* —— U.S. at ——, 113 S.Ct. at 2803.

The defendant claimed that such a forfeiture violated the Eighth Amendment's prohibition on "excessive fines", while the government argued that the "excessive fines" clause only applied to criminal sentences. The Supreme Court held that "fines" for purposes of the Eighth Amendment encompassed not only criminal fines but also any forfeiture that constituted a "punishment". *Id.* at —— & ——, 113 S.Ct. at 2806 & 2810.

However, rather than using *Halper*'s formulation and asking whether the forfeiture could reasonably be construed as compensating the government for loss, the *Austin* Court embarked on an extended examination of the historical roots of forfeiture as a penalty. *Austin,* —— U.S. at ——-——, 113 S.Ct. at 2806–2810. The Court concluded that, with the exception of the forfeiture of contraband, forfeiture was traditionally viewed as a type of punishment, and the Court found nothing "in [the forfeiture] provisions [of 21 U.S.C. § 881(a) ] or their legislative history to contradict the historical understanding of forfeiture as punishment." *Id.* at ——, 113 S.Ct. at 2810.

Concededly, we have recognized that the forfeiture of contraband itself may be characterized as remedial because it removes dangerous or illegal items from society. *See United States v. One Assortment of 89*

*Firearms,* 465 U.S. 354, 364, 104 S.Ct. 1099, 1105, 79 L.Ed.2d 361 (1984). [We have], however, previously ... rejected [the] government's attempt to extend that reasoning to [the forfeiture of] conveyances used to transport illegal liquor. *See One 1958 Plymouth Sedan v. Pennsylvania,* 380 U.S. 693, 699, 85 S.Ct. 1246, 1250, 14 L.Ed.2d 170 (1965). In that case [we] noted: "There is nothing even remotely criminal in possessing an automobile." *Ibid.* The same, without question, is true of the properties involved here, and the Government's attempt to characterize these properties as "instruments" of the drug trade must meet the same fate as Pennsylvania's effort to characterize the 1958 Plymouth Sedan as "contraband".

*Austin,* —— U.S. at ——, 113 S.Ct. at 2811. The Court continued:

Fundamentally, even assuming that §§ 881–(a)(4) and (a)(7) serve some remedial purpose, the Government's argument must fail. "[A] civil sanction that cannot fairly be said *solely* to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term." *Halper,* 490 U.S. at 448, 109 S.Ct. at 1902 (emphasis added). In light of the historical understanding of forfeiture as punishment, the clear focus of §§ 881(a)(4) and (a)(7) on the culpability of the owner, and the evidence that Congress understood those provisions as serving to deter and to punish, we cannot conclude that forfeiture under §§ 881(a)(4) and (a)(7) serves solely a remedial purpose. We therefore conclude that forfeiture under these provisions constitutes "payment to a sovereign as punishment for some offense" [citation omitted], and, as such, is subject to the limitations of the Eighth Amendment's Excessive Fines Clause.

*Austin,* —— U.S. at ——, 113 S.Ct. at 2812 (footnote omitted).

Thus, *Austin* did not rely on *Halper*'s "compensation for loss" test when evaluating whether the forfeiture of a drug offender's house and business was "remedial" or "punitive". Rather, the Supreme Court examined

"the historical understanding of forfeiture", the "focus of [the forfeiture statute] on the culpability of the [property] owner", and the "evidence that [the legislature] understood [the forfeiture] provisions as serving to deter and punish". *Id.*

In *Montana Department of Revenue v. Kurth Ranch,* the Supreme Court made the limitations of the *Halper* test even more explicit. *Kurth Ranch* involved a Montana family who used their farm for the cultivation of marijuana. Each family member was prosecuted for either possessing or conspiring to possess marijuana with intent to sell. —— U.S. at ——, 114 S.Ct. at 1942. In addition, the county instituted a forfeiture action against the cash and equipment used in the marijuana operation. *Id.* Then, the State of Montana filed suit to collect that state's tax on illegal drugs. Under Montana law, this tax was assessed at ten percent of the market value of the illegal drugs, or $100 per ounce of marijuana and $250 per ounce of hashish, whichever was greater. *Id.* at ——, 114 S.Ct. at 1941.

According to the State of Montana's calculations, the Kurth family's tax liability for possessing illegal drugs was almost $900,000. This tax assessment prompted the Kurth family to file for bankruptcy protection. *Id.* at —— ——, 114 S.Ct. at 1942–43. The bankruptcy court first decided that the proper tax assessment was only $181,000. Then, the bankruptcy court ruled that even this lesser tax liability was unconstitutional because collection of the tax would violate the double jeopardy clause. *Id.* at ——, 114 S.Ct. at 1943. Following two more adverse rulings in higher federal courts, the State of Montana brought its case to the Supreme Court.

The Supreme Court recognized that its decision in *Halper* "does not decide the ... question whether Montana's tax should be characterized as punishment". *Kurth Ranch,* —— U.S. at ——, 114 S.Ct. at 1944. "Whereas fines, penalties, and forfeitures are readily characterized as [punitive] sanctions, taxes are typically different because they are usually motivated by revenue-raising rather than punitive purposes." *Id.* at ——, 114 S.Ct. at 1946.

[T]ax statutes serve a purpose quite different from civil penalties, and *Halper*'s method of determining whether the exaction was remedial or punitive "simply does not work in the case of a tax statute". [Citing with approval an assertion in Chief Justice Rehnquist's dissenting opinion, [—— U.S. at ——] 114 S.Ct. at 1950] Subjecting Montana's drug tax to *Halper*'s test for civil penalties is therefore inappropriate.

*Kurth Ranch,* —— U.S. at ——, 114 S.Ct. at 1948.

For example, the Supreme Court recognized that when evaluating a tax law it would not make sense to apply *Halper*'s broad statement that a civil penalty should be deemed "punishment" if the penalty ineluctably served a "deterrent" purpose. The Court noted that "many taxes ... such as [the] taxes on cigarettes and alcohol" are obviously "motivated to some extent by an interest in deterrence". —— U.S. at ——, 114 S.Ct. at 1946. Thus, the Court conceded, "neither a high rate of taxation nor an obvious deterrent purpose automatically marks [Montana's] tax [as] a form of punishment". *Id.* "[W]hile a high tax rate and deterrent purpose lend support to the characterization of the drug tax as punishment, these features, in and of themselves, do not necessarily render the tax punitive." *Id.* at ——, 114 S.Ct. at 1947.

The Court then noted several "unusual features" of the Montana tax statute that "set [it] apart from most taxes". First, liability under Montana's tax law "is conditioned on the commission of a crime ... and is exacted only after the taxpayer has been arrested for the precise conduct that gives rise to the tax obligation in the first place." —— U.S. at ——, 114 S.Ct. at 1947. Next, the Court noted that taxes on illegal activities "differ ... from mixed-motive taxes that governments impose both to deter a disfavored [but legal] activity and to raise money". *Id.*

By imposing cigarette taxes, for example, a government wants to discourage smoking. But because the product's benefits—such as creating employment, satisfying consumer demand, and providing tax reve-

nues—are regarded as outweighing the [product's] harm, [the] government will allow the manufacture, sale, and use of cigarettes as long as the manufacturers, sellers, and smokers pay high taxes that reduce consumption and increase government revenue. [But these] justifications vanish when the taxed activity is completely forbidden, for the legitimate revenue-raising purpose that might support such a tax could be equally well served by increasing the fine imposed upon conviction.

*Kurth Ranch,* —— U.S. at ——, 114 S.Ct. at 1947 (footnote omitted).

Finally, the Supreme Court noted that Montana's marijuana and hashish tax "is exceptional" because, "[a]lthough it purports to be a species of property tax[,] . . . it is levied on goods that the taxpayer neither owns nor possesses when the tax is imposed"—goods that presumably have already been destroyed before the tax is assessed. The Court concluded:

A tax on [the] "possession" of goods that no longer exist and that the taxpayer never lawfully possessed has an unmistakable punitive character. This tax, imposed on criminals and no others, departs so far from normal revenue laws as to become a form of punishment.

*Kurth Ranch,* —— U.S. at ——, 114 S.Ct. at 1948.

Thus, in *Kurth Ranch,* the Supreme Court again refused to employ *Halper*'s "compensation for loss" test when deciding whether Montana's marijuana and hashish taxes were "remedial" or "punitive". The Court recognized that, in the context of taxation, it did not make sense to try to gauge the government's "loss" from the defendant's activity, nor was it fruitful to ask whether the tax was intended to deter the defendant from engaging in the taxed activity (since many traditional taxes have precisely this aim). Rather, the Supreme Court asked whether Montana's tax "depart[ed] so far from normal revenue laws as to become a form of punishment".

■ We therefore reject the defendants' argument that a license revocation must be "punitive" since it does not compensate the government for monetary loss. Just as the Supreme Court did in *Austin* and *Kurth Ranch,* we, too, conclude that *Halper*'s "compensation for loss" formula simply does not apply in the context of the case before us.

Rather, as the Supreme Court did in *Austin* and *Kurth Ranch,* we will examine the historical background and understanding of license revocation to determine whether license revocation has traditionally been viewed as punitive or remedial, and we will examine the structure and operation of Alaska's license revocation statutes to determine what goals these statutes advance.

*Administrative Revocation of Driver's Licenses for Driving Offenses Has Traditionally Been Viewed as Remedial, not Punitive*

The defendants argue that a driver's license is a form of property and that revocation of the license is tantamount to a forfeiture of property. The defendants then rely upon *Austin* and *United States v. $405,089.23 in U.S. Currency,* 33 F.3d 1210 (9th Cir. 1994), for the proposition that any forfeiture of property imposed as a penalty for the commission of a crime constitutes "punishment" for purposes of the double jeopardy clause.

The due process clauses of both the Fourteenth Amendment to the United States Constitution and Article I, Section 7 of the Alaska Constitution protect "life", "liberty", and "property".[3] To insure that citizens receive fair treatment in a broad range of their dealings with government, both the United States Supreme Court and the Alaska Supreme Court have employed a broad definition of "property" in due process cases.

■ For example, the Alaska Supreme Court has classified a driver's license as "an important property interest" for purposes of Alaska's due process clause; the state must therefore grant a hearing to a driver before

---

**3.** The pertinent portion of the Fourteenth Amendment declares, "nor shall any state deprive any person of life, liberty, or property without due process of law". The pertinent portion of Article I, Section 7 states, "No person shall be deprived of life, liberty, or property without due process of law."

his or her license can be revoked. *Graham v. State,* 633 P.2d 211, 216 (Alaska 1981). The United States Supreme Court has similarly ruled that a driver's license is "property" for purposes of the Fourteenth Amendment. State governments must observe certain procedural formalities before they can take away a person's driver's license.

> This is but an application of the general proposition that [the due process clause] limit[s] state power to terminate an entitlement[,] whether the entitlement is denominated a "right" or a "privilege".

*Bell v. Burson,* 402 U.S. 535, 539, 91 S.Ct. 1586, 1589, 29 L.Ed.2d 90 (1971).[4]

Nevertheless, a driver's license obviously is not "property" in the everyday sense. The word "license" means "a formal permission to do something; especially, authorization by law to do some specified thing". *Webster's New World Dictionary* (Third College Edition 1988), p. 779. A driver's license authorizes a person to operate motor vehicles.

The license can not be purchased (except from the government), and it can not be sold or transferred or inherited. The physical object that we often call a "driver's license" is only a piece of plastic that stands as evidence of the real license—the government's authorization. If the government has revoked a person's authorization to drive, that person's continued possession of the piece of plastic means nothing.

█ Thus, revocation of a person's license to drive motor vehicles can not easily be equated with forfeiture of a person's land, money, or other tangible possessions. Revocation of a driver's license is not the equivalent of a "payment to a sovereign", *Austin,* — U.S. at ——, 113 S.Ct. at 2812, for it does not diminish the driver's wealth. Rather, license revocation is akin to a restraining order or injunction, protecting the public from future harm by depriving an unsafe or irresponsible driver of his or her authority to continue to operate motor vehicles.[5]

4. Alaska's due process clause affords drivers greater procedural protection than drivers enjoy under federal constitutional law. Although the Fourteenth Amendment requires states to provide a hearing to a person whose driver's license is revoked because of a breath-test refusal, states may nevertheless summarily revoke the person's license at the time of the breath-test refusal and schedule the hearing later. *Mackey v. Montrym,* 443 U.S. 1, 99 S.Ct. 2612, 61 L.Ed.2d 321 (1979). Under the Alaska Constitution, on the other hand, a driver is entitled to demand a hearing before the revocation. *Graham,* 633 P.2d at 216.

The defendants in this case argue that the license revocation procedure codified in AS 28.15.165–166 can not possibly be "remedial" because the statutes do not impose immediate license revocation on a driver who refuses to take the breath test or who tests at .10 or greater. The defendants argue that these statutes can not be intended to rid the highways of dangerous drivers because the statutes allow a driver to keep his or her license for at least 7 days (longer, if the driver requests a hearing). However, both the 7–day grace period and the continuing authorization to drive pending the administrative hearing appear to be directly attributable to the Alaska Supreme Court's decision in *Graham.*

5. Moreover, even if we were to draw an analogy between revocation of a driver's license and forfeiture of tangible property, this does not lead to the conclusion that the government inflicts "punishment" (for purposes of the double jeopardy clause) whenever the government revokes a person's driver's license for driving misconduct. Not all forfeitures of property are punitive. A

forfeiture can be "remedial" if it is limited to seizing items that are themselves unlawful or dangerous.

For example, in *Austin,* the Court expressly distinguished forfeiture of contraband from forfeiture of a contraband dealer's home or business property:

> [W]e have recognized that the forfeiture of contraband itself may be characterized as remedial because it removes dangerous or illegal items from society. *See United States v. One Assortment of 89 Firearms,* 465 U.S. 354, 364, 104 S.Ct. 1099, 1105, 79 L.Ed.2d 361 (1984).

*Austin,* — U.S. at ——, 113 S.Ct. at 2811. The Court in *Austin* concluded that forfeiture of a contraband dealer's home and business could only be viewed as "payment to a sovereign as punishment for [his or her] offense". *Id.* at ——, 113 S.Ct. at 2812. But neither *Austin* nor *Kurth Ranch* questions the pre-existing rule that forfeiture of dangerous items themselves is a "remedial" sanction.

Thus, even if we were to liken revocation of a driver's license to forfeiture of property, the closest forfeiture analogy would be forfeiture of contraband—forfeiture of items that are themselves hazardous to the public welfare. When a person's conduct shows that he or she is unwilling to abide by the terms of a driver's license, or shows that he or she can not be trusted to drive safely, then that person's continuing authorization to drive is itself a hazard to the public welfare, a potential instrument of public harm. Revocation or "forfeiture" of this authorization is remedial.

The government regulates many activities and occupations. The rationale for this system of regulation is that the public is exposed to an unacceptable risk of harm if the activity or occupation is performed incompetently, recklessly, dishonestly, or with intent to injure. Under these regulatory schemes, a person must obtain a license to pursue the regulated activity or occupation, and the government possesses the power to revoke the license of someone whose conduct demonstrates his or her unfitness to continue in that activity or occupation. Driver's licenses are perhaps the most familiar example, but attorney's licenses to practice law are similarly regulated (see Alaska Bar Rule 15, which lists the grounds on which an attorney's license may be revoked), and Title 8 of the Alaska Statutes contains license revocation provisions for many other professions.[6]

In many instances, the conduct that demonstrates a person's unfitness to pursue the regulated activity or occupation is also potentially criminal. Nevertheless, courts have traditionally declared that administrative action to revoke a license is distinct from any possible criminal prosecution, and administrative revocation of the person's license is not considered punishment for a crime.

For example, in *Baker v. Fairbanks*, 471 P.2d 386 (Alaska 1970), the Alaska Supreme Court extended the right of jury trial to a defendant in any "criminal prosecution". The court defined "criminal prosecution" to encompass any offense for which a conviction "may result in the [defendant's] loss of a valuable license, such as a driver's license or a license to pursue a common calling, occupation, or business." 471 P.2d at 402. Nevertheless, the court was careful to explain that administrative proceedings were not "criminal prosecutions" even though they might result in revocation of a license:

> This [definition of "criminal prosecution"] does not cover revocation of licenses pursuant to administrative proceedings where lawful criteria other than criminality are a proper concern in protecting public welfare and safety, as the basis of revocation or suspension in such instances is not that one has committed a criminal offense, but that the individual is not fit to be licensed, apart from considerations of only guilt or innocence of crime.

*Baker*, 471 P.2d at 402 n. 28. Twenty years later, in *Wik v. Department of Public Safety*, 786 P.2d 384, 387 (Alaska 1990), the Alaska Supreme Court echoed this view: "A [driver's] license is not suspended to visit additional punishment on an offender, 'but in order to protect the public against incompetent and careless drivers.'" (quoting *Robinson v. Texas Department of Public Safety*, 586 S.W.2d 604, 606 (Tex.Civ.App.1979)).

Even after *Halper*, judicial consideration of this issue remains unchanged. A person who loses a professional license in an administrative proceeding is not subjected to "punishment" for double jeopardy purposes, even though the revocation or suspension is based on misconduct that could be (or has been) prosecuted as a criminal offense. *See Loui v. Board of Medical Examiners*, 889

6. Under AS 08.04.450, the Board of Public Accountancy may revoke the license of an accountant for violation of the statutes and regulations governing the profession, as well as for "dishonesty or gross negligence in the practice of public accounting", for conviction of any felony, and for conviction of any crime "an essential element of which is dishonesty or fraud". Under AS 08.06.070, the Department of Commerce and Economic Development may revoke an acupuncturist's license for "deceit, fraud, or intentional misrepresentation in the course of providing professional services", as well as for conviction of "a felony or other crime that affects the licensee's ability to continue to practice competently and safely". *And see* AS 08.11.080 (similar license revocation provisions for audiologists); AS 08.20.170 (chiropractors); AS 08.32.160 (dental hygienists); AS 08.36.315 (dentists); AS 08.45.060 (naturopaths); AS 08.64.326 (physicians, podiatrists, and osteopaths); AS 08.68.270 (nurses); AS 08.70.155 (nursing home administrators); AS 08.72.240 (optometrists); AS 08.80.261 (pharmacists); AS 08.84.120 (physical therapists and occupational therapists); AS 08.86.204 (psychologists); AS 08.87.210 (real estate appraisers); AS 08.98.235 (veterinarians).

*See also* AS 08.18.123 (contractors can have their licenses revoked for "engag[ing] in fraudulent practices"); AS 08.40.170 (similar provision for electrical administrators); AS 08.40.320 (mechanical administrators); AS 08.42.090 (morticians); AS 08.48.111 (architects); AS 08.54.500 (hunting guides); AS 08.55.130 (hearing aid dealers); AS 08.62.150 (marine pilots); AS 08.71.170 (dispensing opticians); AS 08.88.071 (real estate brokers).

P.2d 705, 711 (Hawai'i 1995) ("While the imposition of the one-year revocation of Loui's license to practice medicine [for the attempted rape of his medical assistant] may 'carry the sting of punishment' ... [i]t is clear that the statute in question is not designed to 'punish' Loui; rather, it is designed to protect the public from unfit physicians."); *Kvitka v. Board of Registration in Medicine,* 407 Mass. 140, 551 N.E.2d 915, 918 n. 4 (1990), *cert. denied,* 498 U.S. 823, 111 S.Ct. 74, 112 L.Ed.2d 47 (1990) ("revocation of [a] physician's license [for unlawfully dispensing controlled substances] is considered to be remedial under the double jeopardy clause").

*See also United States v. Hudson,* 14 F.3d 536, 541–42 (10th Cir.1994) (an administrative order barring defendants from future banking activities was not "punishment" for their illegal activities); *United States v. Payne,* 2 F.3d 706, 710–11 (6th Cir.1993) (suspension of a mail carrier for illegal conduct was not "punishment" for double jeopardy purposes); *United States v. Furlett,* 974 F.2d 839, 844 (7th Cir.1992) (A commodities broker defrauded his clients. In an administrative proceeding, his license to deal commodities was revoked. He was later indicted for conspiracy, mail fraud, obstruction of justice, and subornation of perjury. The broker objected that this criminal prosecution violated the double jeopardy clause. Held: the administrative order prohibiting the broker from engaging in commodities trading was not "punishment" for purposes of the double jeopardy clause); *United States v. Bizzell,* 921 F.2d 263, 267 (10th Cir.1990) (Two contractors committed fraud in the sale of various properties whose mortgages were held by the Department of Housing and Urban Development (HUD). The Tenth Circuit ruled that an order barring the two contractors from participating in HUD contracts for 18 and 24 months was not "punishment" for their fraudulent conduct. The court said, "Removal of persons whose participation in those programs is detrimental to public purposes is remedial by definition.").

Courts view administrative suspension or revocation of a driver's license in exactly the same way. The license revocation is "remedial" for double jeopardy purposes. *State v. Savard,* 659 A.2d 1265, 1268 (Me.1995) ("We analogize the driver's license to professional licensing and certification, which, if abused, may be revoked in the name of public safety."); *State v. Higa,* 79 Hawai'i 1, 897 P.2d 928, 933 (1995) ("Hawai'i's [administrative license revocation] proceedings serve legitimate, nonpunitive, and purely remedial functions."); *State v. Funke,* 531 N.W.2d 124, 126 (Iowa 1995) ("This court has traditionally regarded the civil proceedings under our habitual [driving] offender statute as remedial, not punitive, in nature. We have repeatedly observed that the license suspension of habitual offenders is designed not to punish the offender but to protect the public.") (internal quotation omitted) (citation omitted); *Davidson v. MacKinnon,* 656 So.2d 223, 224–25 (Fla.App.1995) ("[T]he administrative remedy of suspending a driver's license because of drunk driving or other related behavior ... continues to be primarily for the purpose of enhancing safe driving on the public highways. Its effect is remedial in a general or universal sense, because it removes dangerous drivers from the highways. And, it can also be viewed as remedial for the individual driver involved, since[,] in an intoxicated state, a driver poses a serious danger to him or herself, as well as to others. As such, [revocation of an intoxicated driver's license] is no more punitive than denying a person who is legally blind a driver's license. Both will live longer and healthier lives if they do not drive."); *State v. Young,* 3 Neb.App. 539, 530 N.W.2d 269, 278 (1995) ("The purpose of license revocation is to protect the public, and not to punish the licensee. The revocation of a driver's license is not a penalty for the violation of the statutes or ordinances involved.... [C]ivil license revocation is therefore remedial and not a punishment, even though the loss of a driver's license in our society carries a considerable 'sting'.") (internal quotation and citation omitted); *Johnson v. State,* 95 Md.App. 561, 622 A.2d 199, 205 (1993) ("We believe ... that *Halper* leaves undisturbed cases, such as the one at bar, that have found the revocation of voluntarily granted privileges to be civil in nature, not punitive, and merely remedial."); *Butler v. Department of Public Safety and Corrections,* 609 So.2d 790, 797 (La.1992) ("Butler's

license suspension, in contrast to Halper's fine, bears a rational relationship to the legitimate governmental purpose of promoting public safety on Louisiana highways."); *State v. Strong*, 158 Vt. 56, 605 A.2d 510, 514 (1992) ("[A] 'bright line' has developed because the nonpunitive purpose of the license suspension is so clear and compelling."); *Freeman v. State*, 611 So.2d 1260, 1261 (Fla.App.1992), *cert. denied*, —— U.S. ——, 114 S.Ct. 415, 126 L.Ed.2d 361 (1993) ("[T]he purpose of the statute providing for revocation of a driver's license upon conviction of a licensee for driving while intoxicated is to provide an administrative remedy for public protection and not for punishment of the offender."); *State v. Maze*, 16 Kan.App.2d 527, 825 P.2d 1169, 1174 (1992) ("The revocation of a driver's license is part of a civil/regulatory scheme that serves a vastly different governmental purpose from criminal punishment. Our State's interest is to foster safety by temporarily removing from public thoroughfares those licensees who have exhibited dangerous behavior[.]"); *Ellis v. Pierce*, 230 Cal.App.3d 1557, 282 Cal.Rptr. 93, 95 (1991) ("Just as the purpose of attorney disbarment or suspension is to protect the public by keeping unfit lawyers from practicing law, the long-range purpose of a driver's license suspension is to protect the public by keeping unfit drivers from driving."); *State v. Nichols*, 169 Ariz. 409, 819 P.2d 995, 999 (App.1991) ("[T]he suspension of the license of an individual found guilty of [driving while intoxicated] 'is not a criminal penalty to punish the driver but a civil and administrative remedy to protect the public from the impaired driver.'") (quoting *Loughran v. Superior Court*, 145 Ariz. 56, 699 P.2d 1287, 1289 (1985).[7]

*Administrative Revocation of a License to Pursue a Regulated Profession or Activity Can Serve Deterrent Purposes and Still Be "Remedial"*

From the above authorities, it is clear that administrative suspension or revocation of a

driver's license has traditionally been viewed, not as punishment for a driver's criminal offenses or traffic violations, but as remedial action prompted by the need to protect the public by removing dangerous drivers from the roads. The defendants in this appeal nevertheless argue that, despite this historical understanding, administrative license revocation must now be viewed as "punishment" under *Halper, Austin,* and *Kurth Ranch*. The defendants rely on the following language from *Halper*:

> [T]he determination whether a given civil sanction constitutes punishment [for double jeopardy purposes] requires a particularized assessment of the penalty imposed and the purposes that the penalty may fairly be said to serve.... [A civil] sanction constitutes punishment when the sanction[,] as applied in the individual case[,] serves the goals of punishment.
>
> These goals are familiar[:] the twin aims of retribution and deterrence.... From these premises, it follows that a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment[.]

*Halper*, 490 U.S. at 448, 109 S.Ct. at 1901–02 (reiterated in *Austin*, —— U.S. at ——, 113 S.Ct. at 2812).

The defendants point out that the possibility of having one's driver's license revoked obviously serves to deter people from driving while intoxicated and from refusing to take the breath test. This has been recognized by the Alaska Supreme Court. See *Lundquist v. Department of Public Safety*, 674 P.2d 780, 785 (Alaska 1983), where the supreme court declared that administrative revocation of a driver's license for refusal to take the breath test is "a nonviolent means of compelling

---

7. The only reported case to the contrary is *Johnson v. State Hearing Examiner's Office*, 838 P.2d 158 (Wyo.1992), involving a statute that called for automatic suspension of a minor's driver's license if the minor was convicted of consuming alcohol. The Wyoming Supreme Court ruled that this statute subjected the minor to an unlawful second punishment. The Wyoming court de-cided this constitutional question even though the issue was "generally not briefed by the litigants" and even though the Wyoming court could find "only one *Halper* case ... of [any] relevance" (the California Court of Appeal's decision in *Ellis v. Pierce, supra*). *Johnson*, 838 P.2d at 179.

submission to a test that provides evidence of intoxication".

Because of this deterrent purpose and effect, the defendants argue, administrative revocation of a driver's license serves one of the goals of punishment and therefore must be deemed "punishment" under *Halper* and *Austin.* We conclude, however, that the defendants have read *Halper* and *Austin* too broadly. As explained in more detail below, we conclude that when the legislature employs a licensing scheme to regulate a profession or an activity affecting the public health or safety, a statute that authorizes a regulatory body to revoke these licenses is "remedial" for double jeopardy purposes even though the law serves to deter licensees from engaging in conduct that is inconsistent with their duties as licensees or that is inconsistent with the public welfare.

The statutes challenged in the present appeal allow administrative revocation of a person's driver's license if that person has a blood-alcohol level of .10 percent or greater, or if that person refuses to take the breath test. As phrased by the Supreme Court in *Halper*, the question this court faces is whether administrative license revocation on these two bases is "so divorced from any remedial goal that it constitutes 'punishment' [under] double jeopardy analysis." *Halper*, 490 U.S. at 443, 109 S.Ct. at 1899. We have no difficulty concluding that substantial remedial purposes underlie the challenged statutes.

A person who operates a motor vehicle when his or her blood-alcohol level is .10 percent or higher poses a clear danger to the public welfare. A person's willingness to engage in such dangerous conduct justifies the inference that his or her continued authorization to drive will likewise pose a danger to the public. The government may act to remedy this danger by revoking the person's driver's license.

While one might suspect that drivers who refuse the breath test believe themselves to be intoxicated, the Alaska Supreme Court has declared that a different remedial goal justifies revoking a driver's license on account of a breath-test refusal. Under Alaska law, all persons who apply for a driver's

license are deemed to have consented to a police-administered chemical test of their breath if they are ever lawfully arrested for driving while intoxicated. AS 28.35.031(a). If a driver refuses to take this breath test, then (regardless of whether the driver is actually intoxicated or not) the driver has broken his or her agreement with the government, and the government can revoke his or her license. *Lundquist*, 674 P.2d at 783 & 785.

For these reasons, we conclude that the administrative revocation of the defendants' driver's licenses is premised on remedial goals. We further conclude that the remedial character of administrative license revocation is not defeated by the fact the license revocation statutes also play a role in deterring misconduct.

We accept the defendants' assertion that administrative revocation of a driver's license may serve to deter that driver from future misconduct and may have a deterrent effect on other drivers who contemplate either driving while intoxicated or refusing the breath test. Indeed, it would be naive to suggest that the legislature did not hope to deter misconduct when it enacted the statutes that allow administrative revocation of licenses— not only driver's licenses, but also the many professional and business licenses covered by Title 8. It is obvious that deterrence of misconduct will be one practical effect of any regulatory scheme that allows the government to revoke a license that authorizes a person to drive motor vehicles or to pursue a livelihood. But this deterrent purpose does not mean that administrative revocation of these licenses is "punishment" for purposes of the double jeopardy clause.

True, *Halper* declares that if a civil monetary penalty can not be explained wholly in terms of remedial goals but must be explained, at least in part, as serving the goal of deterrence, then that civil monetary penalty constitutes "punishment" for double jeopardy purposes. But the monetary penalty at issue in *Halper* was ostensibly intended to compensate the government for monetary loss stemming from Halper's fraud. In such a context, the Supreme Court could justifi-

ably state that the government's declared aim of restitution had to be divorced from the aim of deterrence.

In *Kurth Ranch,* on the other hand, the Supreme Court acknowledged that other types of non-punitive sanctions could legitimately include deterrent aspects. Analyzing the double jeopardy status of Montana's tax on illegal drugs, the Supreme Court recognized that normal taxes are often intended, at least in part, to deter people from engaging in the taxed activity. The Court therefore declared that the *Halper* test did not apply to the situation before it. Instead of asking whether Montana's tax was intended to deter people from using illegal drugs, the Supreme Court asked instead whether Montana's tax "depart[ed] so far from normal revenue laws as to become a form of punishment". *Kurth Ranch,* —— U.S. at ——, 114 S.Ct. at 1948.

Returning to administrative revocation of driver's licenses, the courts that have dealt most cogently with this problem have acknowledged that revocation of a driver's license based on the driver's misconduct does have a deterrent aspect. Nevertheless, these courts have held that administrative revocation remains "remedial". *See State v. Savard,* 659 A.2d at 1268, (Me.1995) ("Although we acknowledge that any suspension may have a deterrent effect on the law-abiding public, our analysis does not focus on that perspective. In the eyes of the defendant[,] even remedial sanctions may carry a 'sting of punishment.' ") (quoting *Halper,* 490 U.S. at 447 & n. 7, 109 S.Ct. at 1901 & n. 7); *State v. Strong,* 605 A.2d at 513 ("Although there is an element of deterrence to the summary suspension of an operator's license, this element is present in any loss of [a] license or privilege[;] [it] is not the primary focus of this statutory scheme."); *Butler v. Department of Public Safety,* 609 So.2d at 797 ("While this court recognizes that the Implied Consent Law, like the Motor Vehicle Habitual Offender Law, is to some extent deterrent ... because the statute attempts to discourage the repetition of criminal acts, this court has previously stated that ... deterrence may be a valid objective of a regulatory statute. The statute's primary

effect is remedial; it removes those drivers from our state highways who have been proven to be reckless or hazardous.") (internal citation omitted).

We, too, conclude that administrative revocation of a driver's license is "remedial" even though it may have a deterrent goal and may achieve some deterrent effect. We hold that, when the government employs a licensing scheme to regulate a profession or an activity that affects the public welfare, administrative revocation or suspension of that license can legitimately serve to deter conduct and still remain "remedial" for double jeopardy purposes so long as the revocation or suspension is based on conduct that bears a direct relation to the government's regulatory goals or to the proper administration and enforcement of the regulatory scheme.

Our conclusion is consistent with, and based upon, the Supreme Court's decisions in *Austin* and *Kurth Ranch.* In *Austin,* the Supreme Court acknowledged that, even though most forfeitures are understood as "punitive", the forfeiture of dangerous substances and contraband is "remedial". *Austin,* —— U.S. at ——, 113 S.Ct. at 2811. Implicit in *Austin's* treatment of these remedial forfeitures is the idea that forfeiture of dangerous substances or contraband remains "remedial" even though such a forfeiture or the threat of such a forfeiture (that is, the threat of losing property that one has paid money for) may deter people from purchasing or dealing in dangerous substances or contraband. What was implicit in *Austin* was made explicit in *Kurth Ranch.* There, the Supreme Court acknowledged that a proceeding to collect taxes is normally not "punishment" even though one legitimate purpose of taxation is deterrence of a disfavored activity. *Kurth Ranch,* —— U.S. at —— ——, 114 S.Ct. at 1946–47.

Reading *Halper, Austin,* and *Kurth Ranch* together, the Supreme Court has said that deterrence is not a legitimate goal of the kind of civil penalty at issue in *Halper* (a penalty designed to achieve "rough" restitution for monetary loss), but deterrence can be a legitimate component of other sorts of non-punitive sanctions. Just as the Supreme Court declined to unreflectively apply the

*Halper* test in *Austin* and *Kurth Ranch*, we conclude that *Halper*'s statements about deterrence do not govern the cases before us.

■ Administrative license revocation is premised on substantial remedial purposes. Even though administrative license revocation has always contained an element of deterrence, the case law demonstrates that it has traditionally been viewed as remedial rather than punitive. We conclude that administrative license revocation continues to be a "remedial" sanction, not a "punitive" sanction, for purposes of the federal double jeopardy clause.[8] Therefore, the administrative revocation of the defendants' licenses is no impediment to their later prosecution for driving while intoxicated, refusing the breath test, or both.[9]

### Conclusion

In the appeals brought by the State of Alaska and the Municipality of Anchorage, the judgements of the district court are REVERSED. In the petition for review (file number A–5739), the judgement of the district court is AFFIRMED. All of these cases are remanded to the district court for further proceedings on the complaints or informations filed against the defendants.

BRYNER, C.J., concurs.

BRYNER, Chief Judge, concurring.

I agree with the court's opinion and I write separately only to emphasize what I see as its core rationale. Whenever the public welfare justifies regulating an activity by implementing and enforcing a licensing requirement, the state will necessarily have a legiti-

mate regulatory—that is, non-punitive—interest in encouraging compliance with the regulations upon which the original issuance and continued validity of the license are conditioned. Conversely, the state will necessarily have a legitimate regulatory interest in deterring noncompliance with these regulations. Thus, in the particular context of a licensed activity, enforcement efforts by the state will always play an essentially remedial role, even if one of the avowed purposes of those efforts is deterrence.

This is not to say that all measures aimed at deterring noncompliance with the laws regulating a licensed activity must be deemed non-punitive. The imposition of sanctions having no direct connection to the regulation of the licensed activity certainly might be deemed punitive in some cases. But the sanction of suspending or revoking a license for noncompliance with the conditions governing its very issuance or continued existence necessarily bears an inherent relationship to the remedial goal of restoring regulatory compliance. Indeed, it is difficult to conceive of any sanction that could more directly remedy a licensee's noncompliance with the regulations governing a licensed activity than suspending or revoking the license itself. Accordingly, under the standards set out in *Halper*, *Austin*, and *Kurth Ranch*, the sanction at issue in the current cases—suspension or revocation of a driver's license for violation of the laws governing the licensed activity of driving—is necessarily remedial, not punitive.

---

8. In one exhortatory paragraph that cites no pertinent legal authority, the defendants urge us to declare that administrative revocation of driver's licenses constitutes "punishment" for purposes of the double jeopardy clause of the Alaska Constitution (Article I, Section 9), even if we conclude that administrative revocation is remedial for purposes of the Federal Constitution.

When a defendant asserts that the Alaska Constitution affords greater protection than the corresponding provision of the Federal Constitution, it is the defendant's burden to demonstrate something in the text, context, or history of the Alaska Constitution that justifies this divergent interpretation. *See e.g., Abood v. League of Women Voters,* 743 P.2d 333, 340–43 (Alaska 1987); *State v.*

*Wassillie,* 606 P.2d 1279, 1281–82 (Alaska 1980); *Annas v. State,* 726 P.2d 552, 556 n. 3 (Alaska App.1986); *State v. Dankworth,* 672 P.2d 148, 151 (Alaska App.1983). Given the defendants' inadequate briefing, this argument is waived.

9. Our resolution of this issue makes it unnecessary for us to address the Municipality of Anchorage's argument that the Municipality is a distinct sovereign government, separate from the State of Alaska, for purposes of the double jeopardy clause. *See,* however, *Waller v. Florida,* 397 U.S. 387, 90 S.Ct. 1184, 25 L.Ed.2d 435 (1970) (a state and its municipalities are not separate sovereigns for double jeopardy purposes), and Article X of the Alaska Constitution.