STATE OF NEBRASKA, APPELLEE, V. RUSSELL J. HANSEN, APPELLANT.

542 N.W.2d 424

Filed January 26, 1996.   No. S-95-312.

William G. Line, of Kerrigan & Line, for appellant.

Don Stenberg, Attorney General, and Kimberly A. Klein for appellee.

WHITE, C.J., CAPORALE, FAHRNBRUCH, LANPHIER, WRIGHT, CONNOLLY, and GERRARD, JJ.

CONNOLLY, J.

In this appeal, we are asked to determine whether the criminal prosecution of a motorist for driving under the influence of intoxicating liquor (DUI) after the motorist's driver's license has been administratively revoked violates the constitutional prohibition against double jeopardy.

Russell J. Hansen appeals from an order of the district court for Dodge County affirming the county court's overruling of Hansen's plea in bar to criminal DUI charges. The court found that the Double Jeopardy Clauses of the U.S. and Nebraska Constitutions are not applicable because the administrative revocation of Hansen's driver's license was remedial in nature and not punitive. We affirm the district court's finding that the Double Jeopardy Clauses do not bar the criminal prosecution of Hansen for DUI because the administrative revocation of his driver's license for 90 days was remedial in nature and that, thus, he is not subject to multiple punishment for the same offense.

## I. ASSIGNMENTS OF ERROR

Hansen alleges the district court erred in not finding that his criminal DUI prosecution was barred by the Double Jeopardy Clauses of the U.S. and Nebraska Constitutions because the DUI prosecution, in addition to the administrative revocation of his driver's license, subjects him to multiple punishment for the same offense.

## II. SCOPE OF REVIEW

Regarding questions of law, an appellate court is obligated to

reach a conclusion independent of determinations reached by the trial court. *State v. Lynch*, 248 Neb. 234, 533 N.W.2d 905 (1995).

## III. BACKGROUND

On November 12, 1994, Hansen was stopped by a deputy of the Dodge County Sheriff's Department in Scribner, Nebraska, for driving at night with a burned out taillight. Upon approaching Hansen's vehicle, the officer detected the odor of alcohol, observed that Hansen's face was flushed, and noted that Hansen's speech was dry mouthed and chalky. Hansen agreed to take a preliminary breath test, the results of which were over the legal limit of .10 grams of alcohol per 210 liters of breath. Hansen was then placed under arrest and transported to the Dodge County Judicial Center in Fremont, Nebraska. At the center, an official breath test was administered with a resultant reading of .143 grams of alcohol per 210 liters of breath. As a result, Hansen was given notice of revocation of his driver's license, a temporary driver's license, and a form to petition for an administrative hearing along with an addressed envelope.

On December 13, 1994, Hansen's driver's license was ordered revoked by the Department of Motor Vehicles for 90 days. At the same time, Hansen was also facing criminal prosecution in the county court for Dodge County for DUI, third offense. Hansen filed a plea in bar alleging that the criminal DUI prosecution was barred by the Double Jeopardy Clauses of the U.S. and Nebraska Constitutions, because he had already been punished for the same offense by having his driver's license administratively revoked. The county court overruled Hansen's plea in bar, and the district court affirmed.

## IV. OVERVIEW OF ADMINISTRATIVE LICENSE REVOCATION PROCEDURE

Preliminarily, we believe it helpful to give a description of Nebraska's administrative license revocation statutes, Neb. Rev. Stat. §§ 60-6,205 to 60-6,208 (Reissue 1993). Under the statutes, a person who is arrested for driving under the influence of alcohol and who submits to a chemical test which discloses the presence of alcohol in any of the concentrations

specified in Neb. Rev. Stat. § 60–6,196 (Reissue 1993), .10 of a gram or more of alcohol per 100 milliliters of blood or .10 of a gram or more of alcohol per 210 liters of breath, shall be served verbal notice by the arresting officer, as an agent of the director of the Department of Motor Vehicles, of the intention to immediately impound and revoke the driver's license of such person and that the revocation will be automatic 30 days after the date of the arrest. § 60–6,205(3).

The arresting officer is then required to take possession of the driver's license and to issue a temporary license, which is valid for 30 days. § 60–6,205(4). The arresting officer is also required to explain the administrative license revocation procedure and the rights of the arrested person, and to provide an addressed envelope and a petition form which may be used to request a hearing before the director of the Department of Motor Vehicles to contest the revocation. *Id.*

The burden of proof is on the State to make a prima facie case for revocation before the director. *McPherrin v. Conrad*, 248 Neb. 561, 537 N.W.2d 498 (1995); *Mackey v. Director of Department of Motor Vehicles*, 194 Neb. 707, 235 N.W.2d 394 (1975). However, once the officer's sworn report is provided, the director's order of revocation has prima facie validity. *Id.* It is then presumed that the revocation will occur unless the offender establishes grounds for reversal by a preponderance of the evidence. *Id.*

If the offender is unable to show cause why his driver's license should not be revoked, then the director shall revoke his license for a period of *90 days* for a first offense and 1 year for the second and any subsequent offense within an 8–year period. § 60–6,206(1). Any person who feels himself or herself aggrieved because of such revocation may petition for judicial review therefrom to the district court of the county where the alleged events occurred. § 60–6,208.

## V. ANALYSIS

### 1. PLEA IN BAR

Before addressing the double jeopardy issue raised by Hansen, we must first address the threshold issue of whether this court has jurisdiction to hear an appeal from an order

overruling a plea in bar arising after Hansen's driver's license was administratively revoked, but before the merits of his criminal DUI prosecution have been litigated.

As a general rule, appeals may be taken only from final judgments. Neb. Rev. Stat. § 25-1901 (Cum. Supp. 1994). Hansen contends that the district court's denial of his plea in bar was a final order appealable when entered. The State contends that the denial was not a final, appealable order because Hansen could ultimately prevail on the merits of his DUI prosecution.

There are three types of final orders which may be reviewed on appeal: (1) an order which affects a substantial right and which determines the action and prevents a judgment,. (2) an order affecting a substantial right made during a special proceeding, and (3) an order affecting a substantial right made on summary application in an action after judgment is rendered. Neb. Rev. Stat. §§ 25-1902 (Reissue 1989) and 25-1911 (Cum. Supp. 1994); *Jarrett v. Eichler*, 244 Neb. 310, 506 N.W.2d 682 (1993); *In re Interest of R.G.*, 238 Neb. 405, 470 N.W.2d 780 (1991).

Thus, whether an order is final and appealable does not always depend upon whether that order completely disposes of the action. *Jarrett v. Eichler, supra.* For example, an order affecting a substantial right made during a special proceeding is a final and appealable order. *Id.* This court has construed the phrase "special proceeding" to mean every civil statutory remedy which is not encompassed in chapter 25 of the Nebraska Revised Statutes. *Jarrett v. Eichler, supra*; *In re Interest of R.G., supra.* The director's authority to revoke Hansen's license does not derive from chapter 25. Rather, the authority is derived from chapter 60. Thus, we are dealing with a special proceeding.

However, the fact that the order arose during a special proceeding does not end our inquiry. To be final and appealable, the order made in such a proceeding must also affect a substantial right. In *State v. Milenkovich*, 236 Neb. 42, 458 N.W.2d 747 (1990), this court said that there is no question that a determination of a nonfrivolous double jeopardy claim affects the substantial right not to be tried twice for the same offense

and concluded that a denial of a plea in bar, filed pursuant to Neb. Rev. Stat. § 29–1817 (Reissue 1989), is a final order as defined in § 25–1902.

However, the State argues that *Milenkovich* dealt with a plea in bar filed after one criminal charge, while another criminal charge was pending, whereas in the instant case, Hansen is attempting to invoke double jeopardy protections from a clearly civil–administrative procedure to a criminal DUI prosecution. As such, the State argues that Hansen's situation is more analogous to *Gruenewald v. Waara*, 229 Neb. 619, 428 N.W.2d 210 (1988). In that case, the defendants filed a plea in bar alleging that a default judgment in one civil case precluded maintenance of another civil suit against them arising out of the same fact pattern. This court found that while the granting of a plea in bar is final and appealable, the trial court's order *overruling* the defendants' plea in bar was not a final, appealable order because the "presently unsuccessful parties may ultimately prevail following a trial on the merits." *Id.* at 621, 428 N.W.2d at 213.

It is true that the merits of Hansen's DUI prosecution have not been litigated and that the revocation of his license was accomplished through a civil–administrative, not a criminal, proceeding. However, in *United States v. Halper*, 490 U.S. 435, 447–48, 109 S. Ct. 1892, 104 L. Ed. 2d 487 (1989), the Supreme Court held:

> In making this assessment [of whether a sanction constitutes punishment for double jeopardy purposes], the labels "criminal" and "civil" are not of paramount importance. . . . The notion of punishment, as we commonly understand it, cuts across the division between the civil and the criminal law, and for the purposes of assessing whether a given sanction constitutes multiple punishment barred by the Double Jeopardy Clause, we must follow the notion where it leads.

If Hansen were not permitted to appeal the denial of his plea in bar until after the merits of his DUI prosecution were litigated, he potentially could be forced to "run the gauntlet" twice—a harm that the constitutional prohibition against double jeopardy was designed to prevent. Thus, we conclude in this

case that a pretrial order denying a plea in bar based on a nonfrivolous double jeopardy claim is appealable because Hansen's substantial rights may be irreparably lost if review is delayed until final judgment.

## 2. DOUBLE JEOPARDY

The 5th Amendment to the U.S. Constitution, which is made applicable to the states through the 14th Amendment, provides in part: "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb." Neb. Const. art. I, § 12, provides: "No person shall . . . be twice put in jeopardy for the same offense."

The U.S. Supreme Court has interpreted the Fifth Amendment's Double Jeopardy Clause to protect against three distinct abuses: (1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense. *United States v. Halper, supra*; *North Carolina v. Pearce*, 395 U.S. 711, 89 S. Ct. 2072, 23 L. Ed. 2d 656 (1969), *overruled on other grounds, Alabama v. Smith*, 490 U.S. 794, 109 S. Ct. 2201, 104 L. Ed. 2d 865 (1989). This court has not construed Nebraska's Double Jeopardy Clause to provide any greater protections than those guaranteed by the federal Constitution. Hansen contends that because he has already had his driver's license administratively revoked, to prosecute him for DUI would subject him to multiple punishment for the same offense. As a result, we must determine whether the administrative revocation of his driver's license for 90 days pursuant to § 60-6,206 constitutes "punishment" for purposes of double jeopardy.

## 3. *UNITED STATES V. HALPER*

Hansen's double jeopardy argument rests on a trio of cases decided by the U.S. Supreme Court: *United States v. Halper*, 490 U.S. 435, 109 S. Ct. 1892, 104 L. Ed. 2d 487 (1989); *Austin v. United States*, 509 U.S. 602, 113 S. Ct. 2801, 125 L. Ed. 2d 488 (1993); and *Department of Revenue of Montana v. Kurth Ranch*, ____ U.S. ____, 114 S. Ct. 1937, 128 L. Ed. 2d 767 (1994). In these cases, the Supreme Court expanded the scope of the Double Jeopardy Clause by construing it to protect

individuals from the imposition of certain penalties, forfeitures, and taxes—monetary impositions that traditionally had not been considered criminal punishments. We find *Austin*, which was a forfeiture case, was decided upon the Eighth Amendment's "Excessive Fines" Clause, and *Kurth Ranch*, which is fact specific to the drug tax context, are inapplicable to the instant case. Thus, for purposes of analyzing Hansen's argument, we begin by discussing *United States v. Halper, supra.*

In *Halper*, the Court held that "under the Double Jeopardy Clause a defendant who already has been punished in a criminal prosecution may not be subjected to an additional civil sanction to the extent that the second sanction may not fairly be characterized as remedial, but *only* as a deterrent or retribution." (Emphasis supplied.) 490 U.S. at 448–49.

In that case, Halper was convicted of submitting 65 false claims for reimbursement under medicare. He was sentenced to 2 years in prison and fined $5,000. Subsequently, the government brought an action against Halper for civil violation of the False Claims Act, and the court granted summary judgment for the government. At that time, the False Claims Act provided for a penalty of $2,000 per violation, which resulted in Halper's civil penalties amounting to $130,000 for the 65 violations for which he had been convicted. However, the total amount of money Halper actually defrauded the government was less than $600.

The Court reasoned:

> Where a defendant previously has sustained a criminal penalty and the civil penalty sought in the subsequent proceeding bears no rational relation to the goal of compensating the Government for its loss, but rather appears to qualify as "punishment" in the plain meaning of the word, then the defendant is entitled to an accounting of the Government's damages and costs to determine if the penalty sought in fact constitutes a second punishment.

490 U.S. at 449–50.

### 4. APPLICABILITY OF *HALPER*

Although *Halper* involved a setting where the criminal case came first and the civil case followed, from the totality of the

cases discussing the issue, it is evident that the order is not significant. See, e.g., *Department of Revenue of Montana v. Kurth Ranch*, 114 S. Ct. at 1958 (Scalia, J., dissenting) ("if there is a constitutional prohibition on multiple punishments, the order of punishment cannot possibly make any difference"). See, also, *U.S. v. Sanchez–Escareno*, 950 F.2d 193 (5th Cir. 1991); *State v. Hanson*, 532 N.W.2d 598 (Minn. App. 1995).

The *Halper* Court was careful to note that "[w]hat we announce now is a rule for the rare case, the case such as the one before us, where a fixed–penalty provision subjects a prolific but small–gauge offender to a sanction overwhelmingly disproportionate to the damages he has caused." 490 U.S. at 449. Thus, on its face, *Halper* may apply only to instances where the government attempts to extract from a person who has committed a punishable act, preceded or followed by a criminal prosecution, a monetary penalty related to the goal of making the government whole.

Unlike *Halper*, in the present case, we are not analyzing the constitutionality of any monetary sanctions designed to compensate the State for losses it sustained as a result of Hansen's criminal actions. Instead, we must look at the principles enunciated in *Halper* to determine whether the 90–day revocation of Hansen's driver's license constitutes a second punishment for purposes of double jeopardy.

### 5. LEGISLATIVE HISTORY AND PLAIN MEANING

The administrative license revocation procedure is codified at §§ 60–6,205 to 60–6,208. Section 60–6,205(1) states:

> Because persons who drive while under the influence of alcohol present a hazard to the *health and safety* of all persons using the highways, a procedure is needed for the swift and certain revocation of the operator's license of any person who has shown himself or herself to be a *health and safety* hazard by driving with an excessive concentration of alcohol in his or her body and to *deter* others from driving while under the influence of alcohol.

(Emphasis supplied.)

The plain language of the statute indicates that the legislative purpose is to protect the public from the health and safety

hazards associated with drunk driving by quickly getting those people who drive while under the influence of alcohol off the road. It is also clear that another purpose the statute is intended to serve is to deter others from driving while under the influence of alcohol.

Hansen argues that since the plain meaning of the statute indicates that one of its purposes is to deter others from driving while under the influence of alcohol, its application constitutes punishment for the purposes of double jeopardy. Hansen further argues that the legislative history of § 60–6,205 supports this claim because some legislators when debating the passage of the statute used the term "deterrent" during their floor speeches.

However, the language used by the legislators, on the floor and in the statute, is not controlling. In *United States v. Halper*, 490 U.S. 435, 447, 109 S. Ct. 1892, 104 L. Ed. 2d 487 (1989), the Court elaborated:

> [W]hile recourse to statutory language, structure, and intent is appropriate in identifying the inherent nature of a proceeding, or in determining the constitutional safeguards that must accompany those proceedings as a general matter, the approach is not well suited to the context of the "humane interests" safeguarded by the Double Jeopardy Clause's proscription of multiple punishments. [Citation omitted.] This constitutional protection is intrinsically personal. Its violation can be identified only by assessing the character of the actual sanctions imposed on the individual by the machinery of the state.

The Court was careful to state, "This is not to say that whether a sanction constitutes punishment must be determined from the defendant's perspective. . . . [F]or the defendant even remedial sanctions carry the sting of punishment." 490 U.S. at 447 n.7. The Court reiterated that "the determination whether a given civil sanction constitutes punishment in the relevant sense requires a particularized assessment of the penalty imposed and the purposes that the penalty may fairly be said to serve." 490 U.S. at 448. Thus, the plain language and legislative history is not dispositive of our inquiry whether administrative license revocations are remedial or constitute punishment for purposes of double jeopardy. Instead, as

directed by *Halper*, we must make a particularized assessment of the penalty or sanction actually imposed and the purpose the statute may fairly be said to serve.

### 6. PURPOSE STATUTE MAY FAIRLY BE SAID TO SERVE

Hansen next contends that the purpose § 60–6,205 may fairly be said to serve is that of punishment. To support his argument, Hansen cites the following language from *Halper*:

> "Retribution and deterrence are not legitimate nonpunitive governmental objectives." *Bell v. Wolfish*, 441 U. S. 520, 539, n. 20 (1979). From these premises, it follows that a civil sanction that cannot fairly be said *solely to serve a remedial purpose*, but rather can *only* be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term.

(Emphasis supplied.) 490 U.S. at 448.

Thus, Hansen argues that the administrative revocation of his driver's license served a deterrent purpose which, based on the aforementioned language, is one of the goals of punishment and therefore must be deemed "punishment" for purposes of double jeopardy.

While it is correct that some appellate courts have acknowledged that the revocation of a driver's license based on the driver's misconduct has a deterrent aspect, none have found that administrative license revocations constitute punishment under the Double Jeopardy Clause. *State v. Zerkel*, 900 P.2d 744 (Alaska App. 1995); *State v. Savard*, 659 A.2d 1265 (Me. 1995); *State v. Higa*, 79 Haw. 1, 897 P.2d 928 (1995); *Baldwin v. Department of Motor Vehicles*, 35 Cal. App. 4th 1630 and 36 Cal. App. 4th 454N, 42 Cal. Rptr. 2d 422 (1995); *State v. Strong*, 605 A.2d 510 (Vt. 1992); *Butler v. Dept. of Public Safety & Corr.*, 609 So. 2d 790 (La. 1992); *State v. Nichols*, 169 Ariz. 409, 819 P.2d 995 (Ariz. App. 1991). The vast majority of other jurisdictions that have interpreted *Halper* have found the following language, and not the language cited by Hansen, to be controlling:

> We therefore hold that under the Double Jeopardy Clause a defendant who already has been punished in a criminal prosection may not be subjected to an additional civil

sanction to the extent that the second sanction may not fairly be characterized as remedial, but *only as a deterrent or retribution.*

(Emphasis supplied.) 490 U.S. at 448–49.

It is important to note that in *Halper*, the Court stated that "the question we face today [is]: whether a civil sanction, in application, may be so divorced from any remedial goal that it constitutes 'punishment' for the purpose of double jeopardy analysis." 490 U.S. at 443. The way the Court framed the issue is indicative of the view that a statute may contain certain punitive qualities and yet remain remedial for purposes of double jeopardy.

It is also noteworthy that in *Department of Revenue of Montana v. Kurth Ranch*, ____ U.S. ____, 114 S. Ct. 1937, 1946, 128 L. Ed. 2d 767 (1994), although the Court found the tax imposed to be excessive and thus punishment, it acknowledged that other types of nonpunitive sanctions could legitimately include deterrent aspects: "We begin by noting that neither a high rate of taxation nor an obvious deterrent purpose automatically marks this tax a form of punishment."

Thus, we find that Hansen has read *Halper* incorrectly. Section 60–6,205(1) makes it clear that the revocation of a motorist's driving privileges primarily serves the remedial purpose of protecting the public health and safety by quickly removing dangerous drunk drivers from the roads. Certainly, this is a rational alternative purpose to the statute's secondary deterrent objective. Thus, we have no difficulty finding that substantial remedial purposes underlie the administrative license revocation statutes and conclude that their remedial character is not defeated by the fact that the statutes also play a role in deterring others from driving drunk. However, our analysis does not end here. We must still make a particularized assessment of the 90–day revocation period actually imposed pursuant to § 60–6,206(1) in order to determine whether it is remedial or constitutes punishment for purposes of double jeopardy.

### 7. ASSESSMENT OF PENALTY ACTUALLY IMPOSED

#### (a) Privilege, Not a Right

We have repeatedly held that driving a motor vehicle is not a

fundamental right, but is a privilege granted by the state. *State v. Green*, 229 Neb. 493, 427 N.W.2d 304 (1988); *Porter v. Jensen*, 223 Neb. 438, 390 N.W.2d 511 (1986); *State v. Michalski*, 221 Neb. 380, 377 N.W.2d 510 (1985); *Prucha v. Department of Motor Vehicles*, 172 Neb. 415, 110 N.W.2d 75 (1961). "A license to operate a motor vehicle in this state is issued, not as a contract, but as a privilege, with the understanding that such license may be revoked for cause by the state." *Durfee v. Ress*, 163 Neb. 768, 772, 81 N.W.2d 148, 150 (1957).

Likewise, the case law of other jurisdictions demonstrates that the revocation of a driver's license is actually the revocation of a privilege voluntarily granted, a traditional attribute of a remedial action. See, *State v. Zerkel*, 900 P.2d 744 (Alaska App. 1995); *Moser v. Richmond County Bd. of Commrs.*, 263 Ga. 63, 428 S.E.2d 71 (1993); *State v. Strong*, 605 A.2d 510 (Vt. 1992); *Butler v. Dept. of Public Safety & Corr.*, 609 So. 2d 790 (La. 1992); *Freeman v. State*, 611 So. 2d 1260 (Fla. App. 1992). " '[R]evocation of a voluntary privilege is "characteristically free of the punitive criminal element." ' " *State v. Savard*, 659 A.2d 1265, 1268 (Me. 1995).

### (b) Historically Remedial

In 1957, this court held that the "purpose of the revocation [of a license] is to protect the public, and not to punish the licensee." *Durfee v. Ress*, 163 Neb. at 773, 81 N.W.2d at 151 (a case involving revocation of a driver's license under the point system). More recently, this court determined that the revocation of a motorist's license under the implied consent laws, for refusing to submit to a breath or chemical test, was a civil action remedial in nature. *Neil v. Peterson*, 210 Neb. 378, 314 N.W.2d 275 (1982). Thus, it is evident that the administrative revocation of driving privileges for driving offenses has historically served a regulatory purpose and has not been regarded as punishment. See, also, *State v. Hanson*, 532 N.W.2d 598 (Minn. App. 1995); *State v. Strong, supra.*

### (c) Analogy to Professional License Revocations

The principles underlying the administrative revocation of a driver's license after refusal to take, or failure of, a chemical

test are closely analogous to the principles underlying the disbarment or suspension of an attorney or doctor after conviction of a crime involving moral turpitude. It has been repeatedly held that the Double Jeopardy Clause does not prevent the revocation of a professional license for conduct which also gives rise to criminal conviction. See, *Loui v. Board of Medical Examiners*, 78 Haw. 21, 889 P.2d 705 (1995); *Schillerstrom v. State*, 180 Ariz. 468, 885 P.2d 156 (Ariz. App. 1994); *Alexander v. State Bd. of Med. Examiners*, 644 So. 2d 238 (La. App. 1994). These courts reasoned that the purpose of revoking or suspending a professional license is not to punish, but to maintain sound professional standards of conduct and to protect the public from unfit lawyers and doctors. *Id.*

Although there is an element of deterrence, and thus a "sting" of punishment, incorporated into the administrative license revocation statutes, this element is present in any loss of license or privilege and is not the primary focus of the statutes. A driver's license is not suspended to deter the offender or seek retribution, but to protect the public against dangerous drunk drivers. See, *State v. Savard, supra*; *State v. Higa*, 79 Haw. 1, 897 P.2d 928 (1995); *State v. Zerkel, supra*; *State v. Nichols*, 169 Ariz. 409, 819 P.2d 995 (Ariz. App. 1991). Simply put, the fact that a statute designed primarily to serve remedial purposes secondarily serves the exemplary purpose of general deterrence as well does not necessitate the conclusion that the statute results in punishment for double jeopardy purposes.

### (d) Not Excessive

The Legislature has determined that a person who operates a motor vehicle when his or her blood-alcohol level is .10 percent or higher poses a danger to the public's health and safety. A person's willingness to engage in such dangerous conduct justifies the inference that his or her continued authorization to drive will likewise pose a continuous danger to the public. In response to this emergency situation, the Legislature requires the director to administratively revoke an offender's driver's license for a period of 90 days for a first offense and 1 year for a second and any subsequent offense within an 8-year period. These swift revocations are the Legislature's attempt to abate

the dangers posed by drunk drivers in the interim period between arrest and prosecution. The temporary 30-day license is issued in order to protect the offender's right to due process.

The Legislature has enacted various guidelines to ensure that the period of revocation is not excessive in relation to the statutes' remedial objectives. For instance, § 60-6,196(5) states in pertinent part that "[a]ny period of revocation or order not to drive imposed under this section shall be reduced by any period imposed under section 60-6,206."

Section 60-6,206 states that after a conviction for DUI the court shall order the offender's driver's license revoked for 6 months. However, if the court places the offender on probation, it shall revoke the offender's license for a period of 60 days. A second-time offender within an 8-year period shall have his or her driver's license revoked for 1 year unless probation is ordered; in which case, the offender's license shall be revoked for 6 months. § 60-6,196(2)(b). An offender of three or more times within an 8-year period shall have his or her driver's license revoked for 15 years unless probation is ordered; in which case, the license shall be revoked for 1 year. § 60-6,196(2)(c).

It is true that an offender's driving privileges may be administratively revoked under § 60-6,206 for a period of time greater than the period revoked if the trial judge chooses to impose probation pursuant to § 60-6,196(2)(a). For example, a first-time offender shall have his or her driver's license administratively revoked for 90 days, whereas if the trial judge chooses probation after a DUI conviction, the offender's license shall be revoked for only 60 days. Under these circumstances, the 30-day disparity cannot be offset as required by § 60-6,196(5). However, whether or not an offender receives the 60-day probationary revocation is discretionary on the part of the trial judge. If the judge chooses not to give probation, or if the offender for one reason or another refuses probation, then the judge is required by § 60-6,196(2)(a) to revoke the offender's license for 6 months. Furthermore, the judge is to impose a mandatory minimum penalty of 7 days' imprisonment and a $200 fine, up to a maximum of 60 days' imprisonment and a $500 fine, pursuant to Neb. Rev. Stat. § 28-106(1) (Cum.

Supp. 1994). As such, it cannot be said that the 90–day administrative revocation is excessive in comparison to the period of revocation and penalty permitted upon a DUI conviction.

Furthermore, an administrative license revocation is a temporary measure that can be administered in various degrees. Section 60–6,206(2) states in part:

> At the expiration of thirty days after an order of revocation is entered under subsection (1) of this section, any person whose operator's license has been administratively revoked for a period of ninety days for submitting to a chemical test pursuant to section 60–6,197 which disclosed the presence of a concentration of alcohol in violation of section 60–6,196(a) may make application to the director for issuance of an employment driving permit pursuant to section 60–4,130 and (b) is eligible for an order pursuant to section 60–6,211.05 to operate a motor vehicle equipped with an ignition interlock device.

Simply stated, temporarily removing a motorist who fails a breath test from the road for 90 days is not excessive as were the civil damages assessed in *United States v. Halper*, 490 U.S. 435, 109 S. Ct. 1892, 104 L. Ed. 2d 487 (1989). Importantly, the Supreme Court deemed *Halper* "the rare case" and was simply of the opinion that the $130,000 civil penalty sought was "overwhelmingly disproportionate" to the $600 that the government was actually defrauded. In the instant case, we do not find this minimal revocation period to be excessive in relation to the remedial goal of protecting the public health and safety. Because our analysis under *Halper* overwhelmingly points to the nonpunitive nature of the administrative license revocation statutes, we must defer to the Legislature's determination of what remedial action is necessary to achieve the Legislature's goals. See *United States v. Ward*, 448 U.S. 242, 100 S. Ct. 2636, 65 L. Ed. 2d 742 (1980).

## VI. CONCLUSION

We find that when the State employs a licensing system to regulate an activity that affects the public health and safety, the administrative revocation of that license can legitimately serve

to deter conduct and still remain remedial for double jeopardy purposes. However, for this to be true the revocation must be based on conduct that bears a direct relation to the government's remedial goals or to the proper administration and enforcement of the regulatory scheme.

Under our administrative license revocation statutes, the revocation of a driver's license subsequent to a prosecution for DUI is part of an overall plan developed by our Legislature for swiftly and surely dealing with the very serious problem of drinking and driving. Any deterrent purpose served by the revocation of a driver's license following an arrest for DUI is merely secondary to the overriding purpose of providing the public with safe roadways.

Thus, we conclude that the Double Jeopardy Clauses of the U.S. and Nebraska Constitutions do not bar prosecuting a motorist for DUI after the motorist's driver's license has been administratively revoked, because such revocation does not subject the offender to multiple punishment for the same offense.

AFFIRMED.

GERRARD, J., dissenting.

There is no doubt that the state has an interest in removing drunk drivers from the road to promote highway safety. However, this interest must be advanced within the framework of the U.S. and Nebraska Constitutions. I dissent because, in my opinion, the driver's license suspension provisions in the administrative license revocation (ALR) statutes, Neb. Rev. Stat. §§ 60–6,205 through 60–6,208 (Reissue 1993), constitute a civil sanction which cannot fairly be characterized as solely serving a remedial purpose and therefore "is punishment, as we have come to understand the term." *United States v. Halper*, 490 U.S. 435, 448, 109 S. Ct. 1892, 104 L. Ed. 2d 487 (1989). Accordingly, since Hansen has been punished by the administrative revocation of his driver's license for driving while under the influence (DUI), he cannot constitutionally be subjected to multiple punishment by criminal prosecution for the same offense of DUI.

## *HALPER* AND *AUSTIN* ANALYSIS

I agree with the majority that Hansen's double jeopardy

argument must be analyzed in light of a trio of U.S. Supreme Court cases: *United States v. Halper, supra*; *Austin v. United States*, 509 U.S. 602, 113 S. Ct. 2801, 125 L. Ed. 2d 488 (1993); and *Department of Revenue of Montana v. Kurth Ranch*, _____ U.S. _____, 114 S. Ct. 1937, 128 L. Ed. 2d 767 (1994). However, I disagree with the majority's view that *Austin* is inapplicable to the resolution of the issues before us in the instant case. Instead, my view is that it is absolutely necessary to analyze and apply the holding of *Halper* in light of the Supreme Court's analysis in *Austin*, as *Austin* is the only Supreme Court case which employs a *Halper* analysis to resolve this specific double jeopardy issue, i.e., whether a particular civil sanction can fairly be characterized as solely remedial. Moreover, *Austin* resolves any ambiguities that existed in *Halper* concerning when a civil sanction's "sting of punishment" can no longer be fairly characterized as solely remedial and, instead, can only be considered punishment as defined by the Supreme Court. 490 U.S. at 447 n.7.

In *Halper*, the defendant was convicted of 65 separate violations of the criminal false-claims statute, sentenced to prison, and fined. Subsequent to his criminal conviction and concerning the same conduct which constituted the criminal convictions, the government filed 65 separate violations of the civil False Claims Act against Halper and recovered the statutorily authorized civil penalty of $2,000 for each violation. Halper complained that this $130,000 penalty bore no rational relationship to the government's costs of investigation and prosecution and was thus not a civil sanction, but a second punishment for the same conduct.

The Court identified that the sole question before it was whether the statutory penalty authorized by the False Claims Act constituted a second punishment for the purposes of a double jeopardy analysis, i.e., "whether a civil sanction, in application, may be so divorced from any remedial goal that it constitutes 'punishment' for the purpose of double jeopardy analysis." 490 U.S. at 443. In this context, the Court concluded that the government is entitled to rough remedial justice; however, when rough justice "authorizes a supposedly remedial sanction that does not remotely approximate the Government's

damages and actual costs, [then] rough justice becomes clear injustice." 490 U.S. at 446. Accordingly, resolution of the question, whether and under what circumstances a civil sanction may be punishment for the purposes of double jeopardy, requires an assessment of "the character of the actual sanctions imposed on the individual by the machinery of the state." 490 U.S. at 447. Furthermore, the U.S. Supreme Court stated:

> In making this assessment, the labels "criminal" and "civil" are not of paramount importance. It is commonly understood that civil proceedings may advance punitive as well as remedial goals, and, conversely, that both punitive and remedial goals may be served by criminal penalties. [Citation omitted.] The notion of punishment, as we commonly understand it, cuts across the division between the civil and the criminal law, and for the purposes of assessing whether a given sanction constitutes multiple punishment barred by the Double Jeopardy Clause, we must follow the notion where it leads. [Citation omitted.] To that end, the determination whether a given civil sanction constitutes punishment in the· relevant sense requires *a particularized assessment of the penalty imposed and the purposes that the penalty may fairly be said to serve.* Simply put, a civil as well as a criminal sanction constitutes punishment when the sanction as applied in the individual case serves the goals of punishment.

(Emphasis supplied.) *United States v. Halper*, 490 U.S. 435, 447-48, 109 S. Ct. 1892, 104 L. Ed. 2d 487 (1989).

Applying these principles to the case at hand, the Court in *Halper* held as follows:

> From these premises, it follows that a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term. [Citation omitted.] We therefore hold that under the Double Jeopardy Clause a defendant who already has been punished in a criminal prosecution may not be subjected to an additional civil sanction to the extent that the second sanction may not

fairly be characterized as remedial, but only as a deterrent or retribution.
490 U.S. at 448–49.

In *Austin v. United States*, 509 U.S. 602, 113 S. Ct. 2801, 125 L. Ed. 2d 488 (1993), the Court revisited the issue of whether a civil sanction constituted punishment when it examined the specific issue of whether the Excessive Fines Clause of the Eighth Amendment applied to civil forfeitures of property. In this case, Austin was indicted on four counts of violating state drug laws. He ultimately pled guilty to one count of possessing cocaine with intent to distribute and was sentenced to 7 years' imprisonment. Subsequent to Austin's indictment, the United States filed an in rem action seeking forfeiture of Austin's mobile home and auto body shop. The district court entered summary judgment for the United States, and this order was upheld by the U.S. Court of Appeals for the Eighth Circuit.

The Supreme Court stated: "The purpose of the Eighth Amendment, putting the Bail Clause to one side, was to limit the government's power to punish. . . . The Excessive Fines Clause limits the Government's power to extract payments, whether in cash or in kind, 'as *punishment* for some offense.' " (Emphasis in original.) 509 U.S. at 609-10. The Court concluded that the question is not whether forfeiture is a civil or criminal sanction, but whether forfeiture is "punishment" in the constitutional sense. Continuing, the Court in *Austin* stated:

> In considering this question, we are mindful of the fact that sanctions frequently serve more than one purpose. We need not exclude the possibility that a forfeiture serves remedial purposes to conclude that it is subject to the limitations of the Excessive Fines Clause. We, however, must determine that it can only be explained as serving in part to punish. We said in *Halper* that "a civil sanction *that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment*, as we have come to understand the term."

(Emphasis supplied.) 509 U.S. at 610.

Similarly, four recent federal court of appeals cases have

followed the guidance of *Austin* in applying the above–stated definition of "punishment" in the context of the Double Jeopardy Clause, and the reasoning of each circuit court is persuasive. See, *U.S. v. Perez*, 70 F.3d 345 (5th Cir. 1995); *U.S. v. Ursery*, 59 F.3d 568, 573 (6th Cir. 1995) (holding that civil forfeiture under 21 U.S.C. § 881(a)(6) constitutes punishment for double jeopardy purposes because *Austin* " 'resolves the "punishment" issue with respect to forfeiture cases for purposes of the Double Jeopardy Clause as well as the Excessive Fines Clause' "); *U.S. v. $405,089.23 U.S. Currency*, 33 F.3d 1210 (9th Cir. 1994) (stating that *Austin* emphasized that sanction which is designed even in part to deter or punish will constitute punishment, regardless of whether it also has remedial purpose, under both Eighth Amendment Excessive Fines Clause and Double Jeopardy Clause in context of civil forfeitures); *U.S. v. Hudson*, 14 F.3d 536, 540 (10th Cir. 1994) (in analyzing whether nonparticipation sanctions and monetary sanctions imposed against bank officials constituted double punishment when defendants were also prosecuted criminally, the Court stated: "Appellants contend that the above quoted language means that unless a sanction is 'solely' remedial, i.e., not serving deterrent or retributive ends, it is punishment. This position is confirmed by the recent Supreme Court decision in *Austin v. U.S.*").

In conducting a *Halper* analysis, that is, in making a particularized assessment of the penalty imposed by forfeiture and the purposes that a civil forfeiture may fairly be said to serve, the Court in *Austin* examined three factors: (1) the historical understanding of forfeitures, (2) the focus of the federal forfeiture statute, and (3) if forfeiture is in part punishment, can the forfeiture, nonetheless, fairly be characterized as solely remedial. The Court eventually concluded that forfeiture pursuant to the federal statute at issue did not solely serve a remedial purpose and that, thus, it was punishment subject to the Excessive Fines Clause.

## APPLICATION OF *HALPER* ANALYSIS

Thus, for Hansen, *Halper* and *Austin* require us to make a particularized assessment of the penalty imposed by a driver's

license suspension and of the purposes that such a suspension may fairly be said to serve. Accordingly, a resolution of the present issue requires: (1) an examination of the historical purpose of driver's license suspensions in the context of drunk driving, (2) an examination of the focus of our ALR statutes, and (3) if suspension of a driver's license within the statutes is in part punishment, may the statutes, nonetheless, be fairly characterized as solely remedial.

*History of Driver's License Suspension in Context of Drunk Driving.*

An examination of our statutes reveals that, even before the enactment of Nebraska's first motor vehicle licensing statute, the suspension of the privilege to drive had been utilized as a form of punishment for drunk driving in this state. The first laws governing use of motor vehicles upon our highways appeared in 1919. In that year, the Legislature made it "unlawful for any person under sixteen years of age, or for any intoxicated person to operate a motor vehicle." 1919 Neb. Laws, ch. 190, § 27, p. 828 (codified at Comp. Stat. § 8391 (1922)). The penalty for violation of § 27 was a fine not exceeding $50 for the first offense, and not less than $50 nor more than $100, or imprisonment not exceeding 60 days in the county jail for each subsequent offense. 1919 Neb. Laws, ch. 190, § 32, p. 830 (codified at Comp. Stat. § 8396 (1922)).

In 1927, the penalty for driving while intoxicated was amended to include suspension of the privilege of driving. In addition to a fine and possible imprisonment generally applicable for other motor vehicle violations, any person found guilty of operating a motor vehicle while intoxicated was to be ordered by the court not to drive a motor vehicle of any description within this state for a period of 1 year from the date of judgment. 1927 Neb. Laws, ch. 153, § 1, p. 411. These laws predate our first motor vehicle licensing statute. Thus, it is evident that even *before* this state enacted its first motor vehicle licensing statute, an order not to drive a motor vehicle was considered to be an effective punishment for the crime of drunk driving.

The Legislature enacted our first motor vehicle licensing

statute in 1929. 1929 Neb. Laws, ch. 148, pp. 512–20. Section 1 proscribed operation of a motor vehicle on the streets, alleys, or public highways without a license obtained from the Department of Public Works. Comp. Stat. § 60–401 (1929). If a motorist was convicted of driving under the influence of alcohol or a narcotic drug, § 12 mandated that a motorist's license be suspended for a period of 1 year from the date of conviction. Importantly, in § 13, the Legislature also gave the director of an administrative agency, the Department of Public Works, the discretionary power to suspend a driver's license for a period of 1 year, if the person was convicted of operating a motor vehicle while under the influence of alcohol or narcotic drugs. Comp. Stat. § 60–413 (1929). This discretionary authority vested in the department director was repealed in 1937 and replaced with the mandatory responsibility to revoke a driver's license upon receiving a record of the operator's criminal conviction of driving while under the influence of alcohol. 1937 Neb. Laws, ch. 141, pp. 506–26.

Of course, under this statutory scheme, courts had the option to suspend a sentence and place an individual on probation, and, therefore, the convicted drunk driver did not always face the mandatory sanction of loss of driving privileges. In response, the Legislature passed 1982 Neb. Laws, L.B. 568, which *mandated* that courts impound driving privileges for certain minimum time periods after a DUI conviction, whether or not probation is granted in a particular case. Thus, historically, driver's license suspensions in the context of drunk driving have been predicated upon an underlying DUI criminal conviction.

In 1992, our statutory scheme regarding license revocation changed dramatically with the enactment of the ALR statutes. Unlike our prior statutes, §§ 60–6,205 through 60–6,208 vest in the director of the Department of Motor Vehicles the authority to revoke a driver's license prior to a motorist's criminal conviction for DUI. Moreover, the statutes require the director to impose a sanction of license revocation upon a motorist that is in excess of the sanction imposed upon a motorist if he or she is subsequently convicted of a criminal charge of DUI as a first– or second–time offender and

sentenced to probation.

For example, § 60-6,206 requires the director to revoke the driver's license of a first-time offender for a period of 90 days and to revoke the license of a second-time offender for a period of 1 year. In contrast, subsequent to a criminal conviction for DUI, a first-time offender who is placed on probation with a minimum sentence is subject to having his or her license impounded by the court for a period of 60 days. A second-time offender who is placed on probation with a minimum sentence is subject to having his or her license impounded by the court for a period of 6 months. Thus, the "remedial" sanction under this scenario is 30 days longer than the "criminal" sanction for the first-time offender, and 6 months longer for the second-time offender. Given this practical reality and the fact that the revocation period arbitrarily increases from 90 days to 1 year between a first-time offender and a second-time offender, it is difficult to glean the "remedial" portion of the ALR sanction.

This type of result is not surprising when we consider the legislative history behind the federal statute that encouraged states to adopt ALR statutes. Chapter 23 U.S.C. § 408(e)(1)(A) (1994) provides grants to states for alcohol traffic safety programs if the state provides for the "prompt suspension . . . of the driver's license [for a minimum of 90 days for a first offender and 1 year for a repeat offender] of any individual who a law enforcement officer has probable cause . . . to believe has committed an alcohol-related traffic offense."

The Congressional intent of this statute is clearly illustrated throughout the legislative history by statements such as: "Historically, license revocation has been treated as a discretionary criminal sanction. This bill, however, recognizes that license revocation is a highly effective deterrent against drunk driving that should not be used exclusively as a criminal penalty imposed only after lengthy court proceedings." 128 Cong. Rec. 26949 (1982) (statement of Sen. Danforth). Further illustration comes from the statement that "the main aim of the bill is deterrence [and] [p]unishment is justified after the fact." 128 Cong. Rec. 25966 (1982) (statement of Rep. Howard). Finally, when the Senate debated amendments to 23 U.S.C. § 408, it was noted that "in 1982 we enacted Public Law

97-364 [23 U.S.C. § 408] . . . to prevent, detect and punish drunk driving." 130 Cong. Rec. 18657 (1984) (statement of Sen. Mathias).

There is little question what Congress had in mind when it handed out inducements to the states to pass ALR statutes in order to combat drunk driving. Seasoned prosecutors and astute legislators know that driver's license revocations are among the most effective tools to punish offenders and deter drivers from operating vehicles when drunk. It is in this context that we will analyze the focus of Nebraska's ALR statutes.

*Focus of ALR Statutes.*

The focus of Nebraska's ALR statutes can be found in § 60-6,205(1), as follows:

> Because persons who drive while under the influence of alcohol present a hazard to the health and safety of all persons using the highways, a procedure is needed for the swift and certain revocation of the operator's license of any person who has shown himself or herself to be a health and safety hazard by driving with an excessive concentration of alcohol in his or her body and *to deter* others from driving while under the influence of alcohol.

(Emphasis supplied.) Thus, the focus of the statutes is ostensibly twofold: to protect the public from unsafe drivers and to deter drivers from operating a vehicle when drunk.

Unlike the majority, I am unable to come to the conclusion that by this statement, the legislative intent is primarily to protect the public and secondarily to deter drunk driving. Moreover, even if the legislative intent to deter was secondary, such an inquiry is irrelevant. The relevant inquiry for our purposes is whether the civil sanction can fairly be characterized as solely remedial. See, *Austin v. United States*, 509 U.S. 602, 113 S. Ct. 2801, 125 L. Ed. 2d 488 (1993); *United States v. Halper*, 490 U.S. 435, 109 S. Ct. 1892, 104 L. Ed. 2d 487 (1989). Even if a particular sanction was intended to deter as a secondary effect, if this secondary effect precludes characterizing the sanction as solely remedial, then the sanction is *punishment* as the U.S. Supreme Court has defined the term. *Austin v. U.S., supra*; *United States v. Halper, supra*.

Let us examine the first stated purpose of the ALR statutes, that is, to protect the public from unsafe drivers. I find nothing in this record that allows one to leap to the conclusion that Hansen is presumptively "a hazard to the health and safety of all persons using the highways" for the next 90 days because he was stopped for a burned out taillight and eventually tested .143 grams of alcohol per 210 liters of breath on a November 1994 evening. If those facts are proved beyond a reasonable doubt in a court of law, then Hansen should be *punished* for the crime of DUI under the laws of the state. However, there is no basis in the ALR statutes or the prior decisions of this court for concluding in every case, regardless of circumstances, that the driver is unsafe for an arbitrary period of 90 days or that recidivism is likely during that period of time.

The underlying premise that every first–offense drunk driver is presumed to be "a hazard to the health and safety of all persons using the highways" for an arbitrary 90–day time period is not based on sound reasoning or any evidence in this record. Notably, the arbitrary length of the administrative law revocation (90 days for a first offender) ensures that it is both longer than necessary to allow the driver time to sober up and become a safe driver—and shorter than necessary to allow any meaningful rehabilitation to occur.

In addition, pursuant to § 60–6,205(4), a license revocation is not effective until 30 days after the date of the arrest in order to allow the offender an opportunity to exercise his or her rights in an administrative hearing. While such a 30–day waiting period is probably constitutionally necessary, it hardly serves the "remedial" goal of swiftly removing an unsafe driver from the highway when he or she is likely to be *the most* unsafe in the hours or days immediately after the arrest.

Moreover, in contrast to several other states that have adopted ALR statutes, our ALR statutes have no requirement of alcohol evaluation, substance abuse treatment, or alcohol abuse education in conjunction with the revocation time period, or as a prerequisite to reinstatement of a revoked license for first– or second–time offenders. Compare Neb. Rev. Stat. §§ 60–6,205 and 60–6,211.05 (Reissue 1993) with Alaska Stat. § 28.35.030(h) (Cum. Supp. 1995) (requiring person convicted

of DUI to satisfy screening, evaluation, referral, and program requirements of authorized rehabilitation agency); Ariz. Rev. Stat. Ann. § 28-692.01(A) (Cum. Supp. 1995) (requiring person convicted of DUI to complete alcohol screening and any necessary additional treatment); Cal. Veh. Code § 23161(b) (West Cum. Supp. 1996); Haw. Rev. Stat. § 286-261(d) (1993) (mandating that offender be referred to certified substance abuse counselor for assessment of offender's alcohol abuse or dependence and need for treatment; if counselor recommends treatment for offender, offender may be ordered to comply); Me. Rev. Stat. Ann. tit. 29-A, § 2502 (West Supp. 1995); and Vt. Stat. Ann. tit. 23, § 1209a (Cum. Supp. 1995) (requiring first-time offenders to submit to alcohol assessment screening to determine whether reinstatement of license should be conditioned on satisfactory completion of therapy program; even if treatment is not ordered, offender must complete alcohol and driving education program at own expense).

If our ALR statutory scheme is really intended to protect the public or remedy the problem of drunk driving in some form, other than swift punishment or deterrence, it is woefully inadequate in that regard.

### ALR Solely Remedial?

One does not have to go beyond the plain language of § 60-6,205(1) to determine that our ALR statutes were intended to serve both a remedial and a punitive goal by acting *to deter* drivers from operating a vehicle when drunk. While the deterrence of drunk driving is unquestionably a proper societal goal, a deterrent purpose in a civil sanction *is punishment* as we have come to understand the term. *Austin v. United States*, 509 U.S. 602, 113 S. Ct. 2801, 125 L. Ed. 2d 488 (1993); *United States v. Halper*, 490 U.S. 435, 109 S. Ct. 1892, 104 L. Ed. 2d 487 (1989). Thus, the final inquiry is, notwithstanding the stated punitive purpose and clear punitive effect, whether our ALR statutory scheme is still capable of being fairly characterized as solely serving a remedial purpose. *United States v. Halper, supra.*

The majority relies to some degree on authority from seven other states which have held that their particular ALR statutory schemes do not constitute punishment for double jeopardy

purposes. However, the majority fails to adequately address the relevant issue. It is not whether another state's ALR statutory scheme is considered punitive or remedial in nature, but whether *this* state's ALR statutory scheme can fairly be characterized as solely remedial.

In fact, of the jurisdictions cited by the majority, all administratively suspend a motorist's license for DUI for the same or a lesser length of time and under similar conditions as the concomitant criminal sanction of driver's license suspension for DUI. See Alaska Stat. § 28.15.165(d) (1994). Compare, Ariz. Rev. Stat. Ann. § 28-692.01 with § 28-694 (Cum. Supp. 1995); Cal. Veh. Code § 23160 with § 13352 (West Cum. Supp. 1996); Haw. Rev. Stat. § 286-261 with § 291-4 (1993); La. Rev. Stat. Ann. § 32:414 with § 32:667 (West Cum. Supp. 1995); Me. Rev. Stat. Ann. tit. 29-A, § 2453 with § 2411 (West Supp. 1995); Vt. Stat. Ann. tit. 23, § 1205 (Cum. Supp. 1995) with §§ 1206 (1987) and 1208 (Cum. Supp. 1995). Also, as stated previously, six of the jurisdictions require some type of alcohol evaluation and substance abuse education or treatment as part of their remedial sanctions.

The majority also cites several pre-1989 cases for the propositions that (1) driving a motor vehicle is not a fundamental right, but a privilege granted by the state, and (2) the purpose of license revocation was historically considered to be remedial in nature. The cites to cases that predate *United States v. Halper, supra,* are of minimal assistance in making a particularized assessment of the penalty imposed in *this* case.

The view that it is somehow important to characterize a driver's license as a right or a privilege is misplaced. The U.S. Supreme Court has referred to the revocation of an operator's license, for procedural due process purposes, as an "entitlement," and not as a mere privilege that could be summarily revoked by a state for cause. See *Bell v. Burson*, 402 U.S. 535, 91 S. Ct. 1586, 29 L. Ed. 2d 90 (1971). This court has acknowledged the U.S. Supreme Court's classification in *Bell* by referring to the revocation of a license as the denial of an entitlement because it oftentimes results in a loss of livelihood to the licensee. See, *Bosselman, Inc. v. State*, 230 Neb. 471, 432 N.W.2d 226 (1988); *State v. Michalski*, 221 Neb.

380, 377 N.W.2d 510 (1985). Unfortunately, this court continues to revert back to erroneously labeling driver's licenses as privileges, and it does nothing to advance the notion of whether the revocation of a license is considered "remedial" or "punitive" in these post–*Halper* times.

Further, in light of *Halper* and *Austin*, the majority's reliance on *Durfee v. Ress*, 163 Neb. 768, 81 N.W.2d 148 (1957), and *Neil v. Peterson*, 210 Neb. 378, 314 N.W.2d 275 (1982), for the proposition that revocation of motorists' licenses has historically been considered a civil action remedial in nature, is outmoded and unhelpful. We are to make a particularized assessment of the penalty imposed, as mandated by the rules of law announced in *Halper* and *Austin*, and the purposes that the penalty may fairly be said to serve.

A particularized assessment of Nebraska's ALR statutes reveals that the administrative sanction (1) is tied directly to the guilt of the accused for the underlying DUI; (2) imposes greater periods of revocation than the concomitant criminal sanction for DUI in many instances; (3) has an arbitrary 90–day license revocation that is longer than necessary for an individual to sober up and become a safe driver, and shorter than necessary for meaningful alcohol rehabilitation to occur; (4) increases the license revocation from an arbitrary 90–day period for first offenders to an arbitrary 1–year period for multiple offenders; and (5) provides for no alcohol evaluation or remedial alcohol education during the revocation period. The ALR statutes are not a model of "remedial" legislation. At least, the Legislature honestly set forth its purpose in § 60–6,205(1) and did not hide the fact that deterring drunk drivers from operating motor vehicles was one of its clear intentions.

Given these characteristics, the driver's license revocation provisions in the ALR statutes cannot be *fairly characterized* as solely serving a remedial purpose and should be deemed punishment as that term is now defined by the U.S. Supreme Court. However, a determination that imposition of an ALR and a subsequent criminal prosecution for the same underlying offense constitutes double jeopardy is not to say that drunk drivers can or will avoid prosecution. As the U.S. Supreme Court noted in *United States v. Halper*, 490 U.S. 435, 450, 109

S. Ct. 1892, 104 L. Ed. 2d 487 (1989):

> Nothing in today's ruling precludes the Government from seeking the full civil penalty against a defendant who previously has not been punished for the same conduct . . . . Nor does the decision prevent the Government from seeking and obtaining both the full civil penalty and the full range of statutorily authorized criminal penalties in the *same proceeding.*

(Emphasis supplied.)

*Halper* and its progeny simply mean that the government's interest in removing drunk drivers from the road must be advanced within the well-established framework of the U.S. and Nebraska Constitutions.

WHITE, C.J., and FAHRNBRUCH, J., join in this dissent.